[No. 600-3.    Division Three.    May 15, 1973.]

THE STATE OF WASHINGTON, *Respondent*, v. JOHN MURRAY *et al., Appellants.*

*R. Max Etter, Sr.,* for appellants.

*Donald C. Brockett, Prosecuting Attorney,* and *Fred J. Caruso, Deputy,* for respondent.

McINTURFF, J.—Defendants John Murray and Linda Simpson were charged by information with the crime of grand larceny by knowingly possessing a Sony TV set, with knowledge that it had been stolen. From a jury verdict of guilty, defendants appeal.

On August 11, 1971 members of the Spokane Police Department arrived at an apartment house at South 164 State Street in Spokane, Washington, to assist an informant in obtaining clothes which she had left in apartment No. 1. While in the apartment the officers observed video television equipment and learned from the informant that these items were stolen. The police determined that the items in apartment No. 1 were stolen from the Liberty High School. The informant indicated that she thought there was some more equipment in apartment No. 11 of the same building.

Pursuant to the search warrant, items in apartment No. 1 were seized. During the course of this search Sgt. G. Mc-Gougan noticed a letter from defendant Simpson to the informant, mentioning Simpson was living with defendant Murray in apartment No. 11. The detective knew the writer of the letter to be a prostitute. Thinking that defendant Simpson would know the whereabouts of one Stigall, whom the police wanted for burglary of the items seized in apartment No. 1, he and another officer set out in a prowl car to see if they could locate her.

The police observed the car Simpson was riding in and stopped it. According to the testimony of the police officers, defendant Simpson was not ordered into the back seat of

the car but was merely requested to do so. The officers further stated that the conversation was not intimidating or coercive; rather, the officers were merely counseling her, but admitted asking questions about the defendant's child and explained that they had a genuine concern about the child's well-being.

Later in the evening, about 9:30, the officers returned to the apartment building and found defendant Simpson sitting on the front porch. They asked her to come to the car and sit in the back seat. Sgt. G. McGougan then requested to search her apartment but she refused.

After more conversation Sgt. G. McGougan informed defendant Simpson that they could obtain a search warrant even if she didn't consent, and that they would leave an officer there to make certain none of the property was taken from the premises during the time they were away acquiring the search warrant. Defendant Simpson further stated that the policeman told her that she should be willing to let them search the apartment if she had nothing to hide, but she said that, although she was unfamiliar with the law, she didn't believe they could search the apartment without a warrant. The police advised her that this was true but that they could easily obtain a warrant. However, it was explained at trial the police didn't want to get a search warrant because they were afraid they would have to disclose the name of their informant.

It was about this time that John Wimerskirch, a friend of Simpson, arrived on the scene and he was also questioned by the police. Thereafter the officers again asked for permission to search and defendant Simpson asked what they were looking for. They told her they were looking for office and video equipment, such as typewriters, calculators, etc. Thereafter, defendant Simpson told them they could search the premises and look for the items mentioned.

In searching the apartment the officers made an extensive search of the premises, opening closets, examining equipment defendant Simpson owned and, although disputed by the officers, Simpson stated that they looked in

the refrigerator. However, on the way out of the premises Sgt. G. McGougan asked Detective Tiegen to get the serial number off the portable TV set which was resting on a chair. He tipped it and wrote down the serial number. The officers then left. They checked the serial number on the TV set, determined it had been stolen, not from Liberty High School but from the Sunset Pharmacy, procured a search warrant, returned, and seized the television set.

The first assignment of error contends that the court erred in refusing to grant the defendant's motion to suppress the evidence because the consent was not freely and voluntarily given and was therefore violative of the defendant's rights under the fourth and fifth amendments to the United States Constitution.[1]

The burden of proof is on the state to show that the consent to search was freely and voluntarily given. *McNear v. Rhay,* 65 Wn.2d 530, 398 P.2d 732 (1965); *State v. Breckenridge,* 4 Wn. App. 328, 481 P.2d 26 (1971); *Bumper v. North Carolina,* 391 U.S. 543, 20 L. Ed. 2d 797, 88 S. Ct. 1788 (1968).

Defendants contend there is evidence which indicated the officers were indirectly threatening the defendant; that the court would possibly deprive her of her child's custody. Sgt. G. McGougan stated that he was interested in the child and was concerned about the child's environment. Sgt. G.

---

[1]"Amendment IV. Security From Unwarrantable Search And Seizure. The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

"Amendment V. Rights Of Accused In Criminal Proceedings. No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury, except in cases arising in the land or naval forces, or in the militia, when in actual service in time of war or public danger; nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb, nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

McGougan is in juvenile work and was sincerely interested in the welfare of the child. Defendants, however, further contend the conversations took place in the police car rather than on the sidewalk or at defendant Simpson's apartment; that because of these facts and other facts in the record the defendant was coerced into finally agreeing to consent.

■ ■ Whether or not the consent was voluntary is a factual question. *State v. Smith,* 72 Wn.2d 479, 434 P.2d 5 (1967). It is the function of the trial court to evaluate the credibility of the witnesses. *State v. Breckenridge, supra.*

■ ■ The trial court found that defendant was not coerced in consenting to allow the search. Mere persuasion does not constitute coercion. *State v. Lyons,* 76 Wn.2d 343, 458 P.2d 30 (1969). The trial court's finding must be given great weight by this court and we find that the finding was amply supported by the evidence.

■ Finding the police had consent to be in the premises of the defendant, was the Sony TV admissible under the "plain view" exception to searches conducted without a warrant?

The plain-view doctrine is firmly embedded in our law, and the guidelines for its application were explained exhaustively in *Coolidge v. New Hampshire,* 403 U.S. 443, 454, 29 L. Ed. 2d 564, 91 S. Ct. 2022 (1971). The Supreme Court said, at page 454:

> Thus the most basic constitutional rule in this area is that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." The exceptions are "jealously and carefully drawn," and there must be a "showing by those who seek exemption . . . that the exigencies of the situation made that course imperative." "[T]he burden is on those seeking the exemption to show the need for it."

(Footnotes omitted.) The court continued, at page 466:

> What the "plain view" cases have in common is that the police officer in each of them had a prior justification

for an intrusion in the course of which he came inadvertently across a piece of evidence incriminating the accused. The doctrine serves to supplement the prior justification—whether it be a warrant for another object, hot pursuit, search incident to lawful arrest, or some other legitimate reason for being present unconnected with a search directed against the accused—and permits the warrantless seizure. *Of course, the extension of the original justification is legitimate only where it is immediately apparent to the police that they have evidence before them; the "plain view" doctrine may not be used to extend a general exploratory search from one object to another until something incriminating at last emerges.*

(Italics ours.)

In *State v. Dimmer,* 7 Wn. App. 31, 497 P.2d 613 (1972) this court clearly stated the prerequisites for invoking the "plain view" doctrine. They are (1) prior justification for an intrusion; (2) an inadvertent discovery of incriminating evidence; and (3) *immediate knowledge* by the police that they had evidence before them.

In the instant case defendant Simpson consented to the search of her premises for specific kinds of articles, *i.e.,* office equipment, including typewriters and calculators, and video equipment. Therefore, there was a justification for being on the premises.

QUERY: Did the officers have immediate apparent knowledge that they had incriminating evidence before them?

In *State v. Palmer,* 5 Wn. App. 405, 487 P.2d 627 (1971), it was held that it was permissible under the "plain view" doctrine for an officer to seize a paper bag which had "challenged his attention" even though the contents were concealed. There were many surrounding circumstances upon which the court concluded the officers had immediate knowledge that incriminating evidence (the paper bag) was before them.

In *State v. Porter,* 5 Wn. App. 460, 488 P.2d 773 (1971), LSD capsules were in plain view and were admitted. In *United States v. Wheeler,* 459 F.2d 1228 (D.C. Cir. 1972) the arresting officer, after impounding the car, noticed a brown envelope in an ashtray. Drawing upon his experi-

ence he "suspected" that it contained narcotics. The evidence was held admissible.

In *Presley v. State,* 284 N.E.2d 526 (Ind. Ct. App. 1972), there was a seizure of a stolen camera without a search warrant in defendant's home at the time of his arrest. The same camera had been reported stolen; therefore, the officer had immediate knowledge incriminating evidence was before him.

In the instant case Sgt. G. McGougan testified in part as follows:

Q What were you looking for?
A The remaining Sony equipment and typewriters taken from the school.
Q In particular, were you looking for a Sony color set?
A No.

. . .

Q [At] the time you got the TV you don't have any independent recollection of having talked with Donna Reedy about that particular TV?
A No. I had no conversation with anyone about that set that evening until Detective Tiegen submitted the number to N.C.I.C.

. . .

Q At any rate, as I understand it, at the time you went into the apartment, what you were looking for were items mostly of office equipment type, at least from what Officer Peoples said, calculators and the like?
A It was my understanding in addition to those items, there was still *TV equipment* missing.
Q Monitoring equipment?
A I don't know.
Q But not this TV?
A If I was given information there was a Sony color TV I would suppose that was *not part of the equipment* but I didn't know it was a color TV; I knew it was Sony.

(Italics ours.)

Detective Tiegen, who was with Sgt. McGougan and who wrote down the serial numbers of the TV, testified in part as follows:

Q *When you first went to Apartment 11, did you know what you were looking for?*

A *We had an idea, yes.*

Q *Did that include a Sony TV set?*

A *No.*

Q What did you have in mind when you got the consent?

A Sgt. McGougan told me other items had been taken in the high school burglary which had not been recovered; *assuming* I had seen some of the items in Apartment 1 which consisted of a camera and a little Sony TV set and several tapes, there was supposed to be some calculators and typewriters.

(Italics ours.)

Detective Tiegen, on cross-examination, testified:

Q Did she [Donna Reedy] tell you at that time there was another color TV besides the one you were talking about in the apartment [Apartment No. 1] at the same time?

A *No, I didn't know about another set.*

(Italics ours.) Sgt. G. McGougan, on cross-examination, had testified:

Q And at that time you came in, you weren't looking for any stolen Sony TV, were you?

A *No way.*

(Italics ours.)

Seizable items which inadvertently come into view of officers who are lawfully searching or who otherwise have a right to be where they are may be retained and used in the prosecution of the crime. *See Harris v. United States,* 390 U.S. 234, 19 L. Ed. 2d 1067, 88 S. Ct. 992 (1968). This statement of the plain-view rule, however, is limited to evidence discovered inadvertently unless contraband, stolen or dangerous objects, and when exigent circumstances exist. The plain view of objects inside a house, even if the police have probable cause, will not, without exigent circumstances, authorize their seizure without a warrant. *See Coolidge v. New Hampshire, supra.*

Sgt. G. McGougan said in "no way" was he looking for a Sony portable color TV, and Officer Tiegen said he was looking for "anything with a screen on it." Yet, it was McGougan who asked Tiegen to write down the serial numbers.

The state contends that the officers felt that the TV set was "incongruent" or totally out of place in that setting. McGougan testified that, under the existing circumstances, it was something that one would normally think would be stolen.

Neither of the officers knew exactly what they were looking for and would therefore not have been able to procure a search warrant until they acquired a specific description of the articles. Since the TV set in question was not one of the articles involved in the burglary of Liberty High School, had the officers gotten a search warrant, would they have been able to seize the serial numbers of the TV in question under the "plain view" doctrine? We decide in the negative.

Exceptions to the seizure of property without a warrant must be carefully scrutinized. The officers had gone by the TV set once without notable concern when entering the premises; they had no specific knowledge that another TV set was involved in the burglary and it was only when they were about to leave that McGougan asked Tiegen to take down the serial numbers. The conclusion that the TV set was incongruent in that setting does not convince the court. In today's society it is difficult to imagine any home without a TV set, or even a color TV. Mere suspicion alone, under the plain-view doctrine, does not rise to the dignity of being an exception to the fourth amendment to the United States Constitution, or article 1, section 7 of the Washington State Constitution.

The officers did not possess the requisite *immediate* apparent knowledge upon which they could reasonably conclude under the "plain view" doctrine they had incriminating knowledge before them, as required by *Coolidge v. New Hampshire, supra.*

The admission of the TV being the "fruit" of the unlawful search, it should have been excluded. *McNear v. Rhay*, 65 Wn.2d 530, 398 P.2d 732 (1965). Therefore, there is insufficient evidence, as a matter of law, to sustain the charge of grand larceny.

Judgment reversed and the information is dismissed.

GREEN, C.J., and MUNSON, J., concur.

Petition for rehearing denied July 5, 1973.

Review granted by Supreme Court October 26, 1973.