[No. 42897.    En Banc.    November 7, 1974.]

THE STATE OF WASHINGTON, *Petitioner*, v. JOHN MURRAY
*et al., Respondents.*

*Donald C. Brockett, Prosecuting Attorney,* and *Fred J. Caruso, Deputy,* for petitioner.

*R. Max Etter, Sr.,* for respondents.

HUNTER, J.—The defendants (respondents), John Murray and Linda Simpson, were convicted of grand larceny by knowingly possessing a stolen Sony television set, following a jury verdict of guilty. The Court of Appeals, Division Three, reversed the judgment of the trial court, and dismissed the information on the grounds of an illegal search and seizure. The petitioner, State of Washington, filed a petition for review with this court, which we granted.

The facts, as shown by the record, are as follows. On August 11, 1971, members of the Spokane police department arrived at an apartment house in Spokane, Washington, to assist an informant in obtaining clothing which she had left in apartment No. 1. While in the apartment the

officers observed video television equipment and learned from the informant that these items were stolen. The police later discovered that the items in apartment No. 1 were stolen from the Liberty High School. The informant also indicated that she thought there was some more equipment in apartment No. 11 of the same building.

Pursuant to a search warrant, the items in apartment No. 1 were seized. During the course of this search Sergeant McGougan noticed a letter from the informant addressed to a known prostitute, stating that Linda Simpson was living with the defendant Murray in apartment No. 11. Thinking that the defendant Simpson would know the whereabouts. of one Robert Stigall, who the police wanted for burglary of the items seized in apartment No. 1, he and another officer set out in a patrol car to see if they could locate her.

Shortly thereafter, the police observed a vehicle in which the defendant Simpson was riding and stopped it. According to the testimony of the police officers, the defendant Simpson was requested to get into the back seat of the car, but was not ordered to do so. The officers further stated that the conversation was not intimidating or coercive; rather, the officers stated that they were merely counseling her, and admitted asking questions about the defendant's child and explained that they had a genuine concern about the child's well-being.

Later in the evening, about 9:30 p.m., the officers returned to the apartment building and found the defendant Simpson sitting on the front porch. They asked her to come to the car and sit in the back seat. Sergeant McGougan then requested to search her apartment, but she refused. After more conversation, Sergeant McGougan informed the defendant Simpson that they could obtain a search warrant even if she didn't consent, and that they would leave an officer there to make certain none of the property was taken from the premises during the time they were away acquiring the search warrant. The defendant Simpson stated that the policeman told her that she should be will-

ing to let them search the apartment if she had nothing to hide, but she said that, although she was unfamiliar with the law, she didn't believe they could search the apartment without a warrant. The police advised her that this was true but that they could easily obtain a warrant.

It was about this time that John Weimerskirch, a friend of the defendant Simpson, arrived on the scene, and he was also questioned by the police. Thereafter, the officers again asked for permission to search apartment No. 11, and the defendant Simpson asked what they were looking for. They told her that they were looking for office and video equipment, such as typewriters, calculators, etc. Thereafter, the defendant Simpson told them that they could search the premises and look for the items mentioned.

In searching the apartment the officers made an extensive search of the premises, opening closets, examining equipment which the defendant owned and, although disputed by the officers, Simpson stated that they looked in the refrigerator. On the way out of the premises, Sergeant McGougan asked Detective Tiegan to get the serial number off the portable television set which was resting on a chair. He tipped it and wrote down the serial number. The officers then left. Shortly thereafter, the officers checked the serial number on the television set, and determined that it had been stolen, not from Liberty High School but from the Sunset Pharmacy in Spokane, Washington. A search warrant was later procured around midnight, and the police officers returned to apartment No. 11 approximately 2 hours later and seized the television set pursuant to the search warrant.

As a result of the seizure of the Sony television set, the defendants were charged with grand larceny by information filed on September 30, 1971. A pre-trial suppression hearing was held, and the evidence was thereafter held admissible at trial where the defendants were convicted after a jury verdict of guilty. The defendants appealed.

The Court of Appeals, Division Three, reversed the judg-

ment and sentence by the trial court, and affirmed the trial court's finding that the defendant's consent to the search of the apartment was voluntary, but ruled that the Sony television set was inadmissible for the reason that the "plain view" exception to searches conducted without a warrant did not apply to the facts of this case. The petitioner thereafter filed a petition for review with this court, which we granted.

As a background for determining the key issue in the petition for review, we must first consider the testimony of the police officers in this case. The record shows some inconsistent statements by Detective Tiegan as to what the police officers were looking for when they searched apartment No. 11, but there is no dispute in the record as to what items the officers told Linda Simpson they were looking for, *i.e.*, office and video equipment, such as typewriters, calculators, etc., and that the consent for the search was granted upon that representation. It is admitted that the officers did not find the equipment they were looking for and the court so found. This is implicitly demonstrated by the following colloquy at the pre-trial suppression hearing during Detective Tiegan's testimony on direct examination:

Q. Did you know what you were looking for when you entered the apartment? Did you have a definite idea of what might be in there? A. I had an idea of some of the items, but not all of them. Q. What items did you think might be in there? A. Calculators. THE COURT: As I understand it, he didn't find any items in there he was looking for. MR. ETTER: That is right. THE COURT: The question before me is solely this, first was there consent, second assuming there was consent may they subsequently seize the Sony. MR. ETTER: That is it. THE COURT: So I don't care about this other stuff.

The court, in its memorandum decision in the suppression hearing, also implicitly found that the officers were looking only for adding machines, calculators and video

equipment, and expressly determined that none of these items was found. The court stated:

> Finally, she asked them what they were looking for, to which they said they were looking for adding machines, calculators and video equipment. . . .
>
> . . .
>
> In any event, the officers in the apartment did not find any fruits of the burglary of Liberty High School . . .

The admission of the officers that they were not looking for the Sony television set is as follows. Sergeant McGougan, at the suppression hearing, stated:

> Q. You said something about office equipment and typewriter. A. And video, yes. Q. And video— A. Equipment. Q., And at that time when you came in, you weren't looking for any stolen Sony TV, were you? A. No way.

Detective Tiegan, at the suppression hearing, testified as follows:

> Q. The things that you told Mrs. Simpson that you wanted to search for, there were none of them in the apartment, isn't that true? A. It's true. I didn't ask her.

Detective Tiegan, at the trial on the merits, further testified:

> Q. When you first went to Apartment 11, did you know what you were looking for? A. We had an idea, yes. Q. *Did that include a Sony TV set? A. No.* Q. What did you have in mind when you got the consent? A. Sgt. McGougan told me other items had been taken in the high school burglary which had not been recovered; assuming I had seen some of the items in Apartment 1 which consisted of a camera and a little Sony TV set and several tapes, there was supposed to be some calculators and typewriters.

(Italics ours.)

The judge at the suppression hearing, however, held that the plain view doctrine applied to the following facts:

> [T]hey did see a television set reposing on a chair in the bedroom. To one officer this seemed somewhat incongruous. Knowing that some such sets are stolen, the officer went to the chair *without permission* or objection

of the defendant, tilted the set in order to get the number therefrom and then left the apartment without the set.

(Italics ours.)

The suppression hearing judge, in his memorandum opinion, further stated:

*After several questionings as to what the officers were looking for, she gave them consent to enter her apartment.* The court must find that this was voluntarily done, without coercion and duress, *she believing at that time that they were looking only for the machines from the Liberty High School burglary, and the court is of the opinion that she knew such equipment was not in her apartment and that is the key to the reason why she gave consent.* That is the explanation for her actions. . . .

A critical question is whether or not the television set, *which was found not as a result of the search for which consent was given,* but which accidentally appeared, should be suppressed; whether or not it is admissible under the "plain view doctrine."

(Italics ours.)

The issue then before this court is whether the plain view doctrine can be applied under the facts of this case where the Sony television set, which was tilted, and from which the serial numbers were taken, was not seized as a result of the search for which the consent was given. The judge at the suppression hearing held that the plain view doctrine did apply and the trial judge at the trial on the merits adopted the reasoning of the suppression hearing judge, also holding that the plain view doctrine applied.

■ The plain view doctrine was extensively discussed and reenunciated by the United States Supreme Court in the recent case of *Coolidge v. New Hampshire,* 403 U.S. 443, 29 L. Ed. 2d 564, 91 S. Ct. 2022 (1971). The quotations from that decision by our Court of Appeals in the instant case (*State v. Murray,* 8 Wn. App. 944, 948, 509 P.2d 1003 (1973)), are most pertinent:

The plain-view doctrine is firmly embedded in our law, and the guidelines for its application were explained exhaustively in *Coolidge v. New Hampshire,* 403 U.S.

443, 454, 29 L. Ed. 2d 564, 91 S. Ct. 2022 (1971). The Supreme Court said, at page 454:

> Thus the most basic constitutional rule in this area is that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." The exceptions are "jealously and carefully drawn," and there must be a "showing by those who seek exemption . . . that the exigencies of the situation made that course imperative." "[T]he burden is on those seeking the exemption to show the need for it."

(Footnotes omitted.) The court continued, at page 466:

> What the "plain view" cases have in common is that the police officer in each of them had a prior justification for an intrusion in the course of which he came inadvertently across a piece of evidence incriminating the accused. The doctrine serves to supplement the prior justification—whether it be a warrant for another object, hot pursuit, search incident to lawful arrest, or some other legitimate reason for being present unconnected with a search directed against the accused —and permits the warrantless seizure. *Of course, the extension of the original justification is legitimate only where it is immediately apparent to the police that they have evidence before them; the "plain view" doctrine may not be used to extend a general exploratory search from one object to another until something incriminating at last emerges.*

The Court of Appeals, in *State v. Dimmer,* 7 Wn. App. 31, 33, 497 P.2d 613 (1972), correctly analyzes *Coolidge v. New Hampshire, supra,* and the application of the plain view doctrine as follows:

> In *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971) it was held that objects in plain view found inadvertently by police officers while searching under a valid warrant may be seized if it becomes immediately apparent to the police that they have evidence before them. This "plain view" doctrine is an exception to the strict rule announced in *Marron v. United States,* 275 U.S. 192, 48 S. Ct. 74, 72 L. Ed. 231

(1927). The Supreme Court held, in 275 U.S. 192, 196, that:

> The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant.

The court, in *Coolidge*, has now carved out a common sense "plain view" exception to this rule with limiting safeguard requirements added to assure that a proper limited search does not become an unconstitutional general exploratory search. These safeguard requirements needed to justify a "plain view" seizure include: *a prior justification for intrusion, an inadvertent discovery of incriminating evidence, and immediate knowledge by police that they have evidence before them.*

(Italics ours.)

In the instant case the initial intrusion by the officers was justified since they had obtained the consent of the defendant Simpson to search apartment No. 11. However, the search under this record was limited to items that had been stolen from the Liberty High School. The Sony television was not one of these items and it was not subject to seizure under the plain view doctrine since the officers did not have immediate apparent knowledge that they had incriminating evidence before them. *Coolidge v. New Hampshire, supra.*

Under these facts, the police did not know the television set was incriminating until after the serial numbers had been checked with police headquarters. In this regard, the petitioner contends that the television set was incongruous and the exigencies of the circumstances caused the officers to suspect that it had been stolen. We agree with the Court of Appeals, however, that there was nothing unusual about the location of this set as to its utility and usability in the defendant's premises. To say it looked incongruous because, as stated by Detective Tiegan, he thought the television set was more than likely stolen since the defendant was appar-

ently unemployed at the time and could probably not afford a television set, would be pure speculation.

We, therefore, hold that the trial court erred in allowing the seizure of the television set under the plain view doctrine since the officers did not possess the requisite immediate knowledge upon which they could reasonably conclude that they had incriminating evidence before them. *Coolidge v. New Hampshire, supra.*

■ The petitioner further argues that the taking of the serial numbers was not a seizure. The facts cannot support this conclusion. The serial numbers were not within the plain view of the officers, and their being obtained by the tilting of the Sony television constituted a warrantless seizure of those numbers.

*United States v. Gray,* 484 F.2d 352 (6th Cir. 1973), supports our holding that the taking of the serial numbers constituted a seizure. In that case Kentucky law enforcement officers had reliable information that the operator of a grocery store was selling beer without a license. The officers properly obtained a search warrant which directed the seizure of "any intoxicating liquors, apparatus for manufacturing intoxicating liquors or materials used in the manufacture of intoxicating liquors." In searching the store premises for the specific items described in the warrant, one of the officers noticed two rifles leaning against a wall in an upstairs closet, and removed the rifles from the closet and took them to the store area where he copied down the serial numbers of the weapons. The serial numbers were later checked, and it was discovered that the firearms had been stolen. A second search warrant was later procured upon which the officers returned and seized the two rifles. After holding that the seizure of the rifles was not justified under the plain view doctrine, the United States Court of Appeals of the 6th Circuit stated as follows on page 356:

> The government argues that Trooper Brodt's actions were not a search or a seizure. Whether or not the officer's actions constituted a technical search, they clearly were a seizure. Officer Brodt, to be sure, could not

help noticing the rifles in the closet as he had every right to do. But he did not simply see or observe the presence of the rifles (which as we have indicated were not contraband nor recognized by the officer to be such). Instead he removed them from the closet, carried them to the lower floor of the building and then copied down the serial numbers. The fact that he did not take the rifles with him after conducting the search does not make his actions any less a seizure. *Removing the rifles from the closet was a seizure as was the copying down of the serial numbers. See* United States v. Sokolow, 450 F.2d 324 (5th Cir. 1971).

(Footnote omitted. Italics ours.)

The petitioner further argues that Detective Tiegan stated that he was looking for any television screens, and that he suspicioned the Sony television could have been an item stolen from the Liberty High School since one of the items stolen in apartment No. 1 looked like a television set. This rationalization to justify the seizure is untenable in view of his admission at the trial that the Sony television was not one of the items they were looking for, and in view of the factual determination by the suppression hearing judge that the Sony television was not included in any of the items stolen from the Liberty High School for which they were searching.

The determination of the Court of Appeals is affirmed and the trial court is reversed.

ROSELLINI, STAFFORD, UTTER, and BRACHTENBACH, JJ., concur.

WRIGHT, J. (dissenting)—I dissent. The recitation of the facts by the majority is accurate and I adopt such facts.

I would reverse the Court of Appeals for two reasons, either of which would adequately justify such a reversal and the reinstatement of the judgment of the trial court. The reasons are (1) a television set is video equipment, and as such is within the consent given to search the apartment, (2) the act of slightly tipping a television set sitting on a chair and copying the serial number therefrom is not a

constitutionally impermissible act under the facts and circumstances here present.

Consent was given to search for video and office equipment. The definition of "video" as found in *Webster's Third New International Dictionary* (1968), whether as an adjective or as a noun is equivalent to "television," and reads as follows: "relating to or used in the transmission or reception of the television image." A consent to search for video equipment would include the consent to search for television sets. A search can be by consent. *State v. Greco,* 52 Wn.2d 265, 324 P.2d 1086 (1958); *Schneckloth v. Bustamonte,* 412 U.S. 218, 36 L. Ed. 2d 854, 93 S. Ct. 2041 (1973).

The burden of proof is upon the State to establish that consent was freely given without coercion. The trial court found that the consent was voluntary. The Court of Appeals affirmed that finding. *State v. Murray,* 8 Wn. App. 944, 509 P.2d 1003 (1973).

In a number of recent cases it has been held the observing and checking of serial numbers even if in places which are difficult to observe is not a search. One of the cases most similar to the present case is *United States v. Gunn,* 428 F.2d 1057 (5th Cir. 1970), in which it was held the copying of serial numbers of tires was not a search. In that case the officer had to crawl under the vehicle to read the numbers. Therein the court said in part at page 1060:

> We dispose quickly of Gunn's search-and-seizure argument regarding the serial numbers of the tires. The inspection of tires on a motor vehicle, performed by police officers entitled to be on the property where the vehicle was located, which in no way damaged the tires or the vehicle and was limited to determining the serial numbers of the tires was not a search within the Fourth Amendment. Alternatively, if the inspection is deemed to have constituted a Fourth Amendment "search," a search warrant was not necessary because the inspection was reasonable and did not violate Gunn's right to be secure in her person, house, papers, or effects. United States v. Johnson, 5 Cir., 1969, 413 F.2d 1396, 1399-1400, pending decision en banc; United States v. Graham, 6 Cir., 1968,

391 F.2d 439; Cotton v. United States, 9 Cir., 1967, 371 F.2d 385.

In this case the police had reason to believe they had found something which should be investigated. The fairly expensive color television set was sitting upon a chair in the apartment of a person who would not normally be expected to have such an item. The television set was of the general kind and type of equipment known to have been stolen. As one experienced officer testified, in the setting in which he saw the television set, he would normally expect it had been stolen. It was in plain view and thus came within the rule of *Coolidge v. New Hampshire,* 403 U.S. 443, 29 L. Ed. 2d 564, 91 S. Ct. 2022 (1971). *See also State v. Dimmer,* 7 Wn. App. 31, 497 P.2d 613 (1972); and *State v. Porter,* 5 Wn. App. 460, 488 P.2d 773 (1971).

For either of the reasons stated, the Court of Appeals should be reversed and the judgment of the trial court should be reinstated.

HALE, C.J., and FINLEY and HAMILTON, JJ., concur with WRIGHT, J.

Petition for rehearing denied December 18, 1974.