[No. 24279-6-II. Division Two. January 26, 2001.]

THE STATE OF WASHINGTON, *Respondent*, v. LARRY EDWARD JOHNSON, *Appellant*.

490

*Edward L. Dunkerly* (of *Ihringer & Dunkerly*), for appellant.

*Arthur D. Curtis, Prosecuting Attorney,* and *Kimberley R. Farr, Deputy,* for respondent.

MORGAN, J. — Larry Edward Johnson appeals his conviction for possessing videotapes of a minor engaged in sexually explicit conduct. He claims that the police illegally seized the videotapes for which he was convicted; that the evidence is insufficient; and that one facet of his sentence is unlawful. We affirm, except for the one facet of his sentence.

In late October 1997, sisters CL and DL, ages 8 and 10, alleged that Johnson had sexually abused them while they were visiting in his apartment. CL said that on at least three occasions Johnson had massaged her genital area with a "long" vibrating massager that had "an 'on button' on the handle" and a "round thingy on the end with green bumps on it."[1] DL said that on at least one occasion Johnson had digitally penetrated her vagina, and that she had seen the massager described by CL. Neither girl said anything about writings, tapes, or objects other than the massager. A physician examined each girl and found physical symptoms consistent with sexual abuse and inconsistent with accident.

On December 3, 1997, Detective Maureen Pea-Schuman of the Vancouver Police Department requested a warrant to search Johnson's home for the massager and other items. She based her request on the girls' statements as described above, and on the following assertions:

I have been a detective assigned to the Child Abuse Intervention Center since April 1992. In that capacity I have investigated over 400 child abuse cases and have received 350 plus hours of training specifically related to child sexual abuse.

[1] Ex. 8 at 8.

Through my training and experience, I have learned that adults who are sexually attracted to or sexually involved with children use sexually explicit materials . . . for lowering the inhibitions of children, sexually stimulating children and themselves, and for demonstrating the desired sexual acts before, during, and after sexual activity with children. Further, they often use sexual aides [sic] such as dildoes fashioned after a man's penis of various sizes and shapes, in addition to other sexual aides [sic], such as a massager, in the seduction of their victims. . . . Those materials are treated as prize possessions. They often maintain diaries of their sexual encounters with children. These accounts of their sexual experiences are used as a means of reliving the encounter when the offender has no children to molest. Such diaries might consist of a notebook, scraps of paper, or a formal diary. Depending on the resources available to the offender, they may be contained on audio tape or computer entries in a "home computer."[2]

Also on December 3, the Clark County District Court issued the requested warrant. It authorized a search of Johnson's apartment for:

1) Any sexual aides [sic] consisting of "sex toys" such as rubber penis' [sic] or dildoes of various sizes, shapes, and construction, including a vibrating massager described as having a long handle with an on/off switch with a round end, 2) Magazines, books, movies, and photographs depicting nudity and/or sexual activity of juveniles or adults, as well as collections of newspaper, magazine, and other publications clippings of juveniles which tend to demonstrate a particular sex and age preference of Larry William [sic] Johnson, 3) Correspondence, diaries, and any other writings, tape recordings, or letters relating to any juvenile and/or adults which tend to show the identity of juveniles and adults and sexual conduct between juveniles and adults[.][3]

On December 4, 1997, at 9:30 a.m., Pea-Schuman and Detective Evelyn Oman went to Johnson's apartment. Both were in plain clothes. One knocked, and Johnson came to the door. Pea-Schuman said they were police officers who

---

[2] Ex. 5.

[3] Ex. 6.

"needed to talk to him about some allegations of sexual contact with children[,]" and they "wondered if he would agree to speak with" them.[4] She did not tell him they had a warrant.

Johnson invited them into the living room, where they advised him of his *Miranda*[5] rights. He waived those rights, and they questioned him for about an hour. During that time, he voluntarily produced and displayed a vibrating massager matching the one described by CL and DL. At first, he said he had used the massager on the girls' "back, tummy, legs, or things like that."[6] Later, he said he had used the massager for sexual contact, but not for penetration.

At about 10:35 a.m., Pea-Schuman told Johnson he would be arrested. She also said they would like to search the apartment. She asked "if that would be okay with him or if he would rather we have a search warrant, that it was totally his choice."[7] Johnson responded, "Search away[,]"[8] and at 10:38 a.m. signed a consent-to-search form. The form stated:

BEFORE ANY SEARCH IS MADE, YOU MUST UNDER-STAND YOUR RIGHTS

(1) You may refuse to consent to a search and may demand that a search warrant be obtained prior to any search of the property described below.

(2) If you consent to a search, anything of value as evidence seized in the course of the search can be used in court against you.

I HAVE READ THE ABOVE STATEMENT OF MY RIGHTS AND UNDERSTAND THESE RIGHTS.

I HEREBY CONSENT TO A SEARCH WITHOUT WARRANT

---

[4] Ex. 8 at 9.

[5] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[6] Ex. 8 at 10.

[7] Ex. 8 at 13.

[8] Ex. 8 at 14.

OF [MY HOME] . . . AND I HEREBY AUTHORIZE THESE OFFICERS TO SEIZE ANY ARTICLE WHICH THEY CONSIDER TO BE OF VALUE AS EVIDENCE.

THIS STATEMENT IS SIGNED OF MY OWN FREE WILL WITHOUT ANY THREATS OR PROMISES HAVING BEEN MADE TO ME.[9]

During the next five or ten minutes, a patrol officer and two more detectives arrived at the apartment. Pea-Schuman told Johnson that the two detectives were there to help search the apartment, and Johnson said "that would be okay."[10] The patrol officer took Johnson to jail.

At 10:56 a.m., detectives started searching the apartment. In Johnson's bedroom, according to Pea-Schuman, they found

one unmarked video tape. This video tape was placed into the VCR to view while we were there. After a few short moments of what appeared to be general T.V., the tape turned black, then focused on a small girl sleeping on what appeared to be a couch. As the focus went wide angle and close-up on the face of the child, the child appeared to be approximately ten to twelve years of age. . . . This panned to a child's genitalia being exposed, the underwear removed to the side, the legs spread apart. As the video progressed, what appeared to be a male hand began massaging and fondling the child's genital area. . . . This particular scene ended, more pornography continued with . . . what appeared to be an adult female, [and] the tape ended once again with regular T.V.[11]

In a hall closet,

there was another video tape found on the tape shelf. This video tape was also unmarked. When placed into the VCR, again, there appeared to be regular T.V. and then spliced into it was the same scene as we had earlier seen with the child being fondled by what appeared to be an adult male hand.[12]

---

[9] Ex. 3.

[10] Ex. 8 at 13.

[11] Ex. 8 at 14.

[12] Ex. 8 at 14.

The second videotape was a copy of the first, and neither showed CL or DL.

At 2:50 p.m., the officers finished their search of the apartment. They seized as evidence the two videotapes with the fondling scene, the vibrating massager, and many other items. Only the two videotapes were later admitted at trial.

After finishing at the apartment, Pea-Schuman and Oman went to the county jail, where they again advised Johnson of his *Miranda* rights. He indicated he was willing to talk and signed another *Miranda* waiver form. When asked about the videotape with the sleeping child, he said he had made the tape about 10 years earlier; that he did not remember the child's name; and that the adult male hand was his.

The State charged Johnson with unlawfully possessing pictures of a minor engaged in sexually explicit conduct.[13] The State based the charge on RCW 9.68A.070 and the two videotapes. RCW 9.68A.070 provides that "[a] person who knowingly possesses visual or printed matter depicting a minor engaged in sexually explicit conduct is guilty of a Class C felony."

Johnson moved to suppress the two videotapes. He argued in part that the affidavit for the warrant did not show probable cause to seize or view the videotapes, and that his consent had been obtained in violation of *State v. Ferrier*.[14] He concluded that the police had seized and viewed the videotapes without justification.

The trial court denied the motion to suppress. It reasoned that *Ferrier* did not apply in a situation of this kind, and that Johnson had voluntarily consented to a search of his apartment. It agreed with Johnson, however, that the affidavit for the warrant did not show probable cause to seize or view the tapes. On the latter point, it stated:

---

[13] This is according to both parties. Br. of Appellant at 1; Br. of Resp't at 3. Neither has included the charge in the record on appeal, and neither has shown whether Johnson was convicted for the alleged abuse of CL and DL.

[14] 136 Wn.2d 103, 960 P.2d 927 (1998).

The trend in search warrant affidavits is to particularly describe those items for which information exists, justifying a belief that such are present in the premises to be searched, and then to generalize about items which an officer's "training and experience" dictate "are commonly found" in the residences of a generalized class of persons such as "drug dealers" or "sex offenders." This trend appears in this affidavit. The test for probable cause is whether or not, under all the circumstances, a reasonable person would believe that evidence of a crime is probably present in the premises to be searched. The "training and experience" and "commonly found" language does no more than state it is possible that certain evidence will be found, or has been found in the past in other cases; not that it is probable that such evidence exists in a particular case. "Probable["] means more likely than not[.]

. . . .

The warrant is clearly overbroad. Nothing in the content of the affidavit sets out facts to believe that sex toys or dildos were used in these alleged offenses, and are therefore evidence of a crime. Likewise, no facts set out in the affidavit establish a likelihood that magazines, books, photographs and other publications depicting nudity or sexual performance of the defendant are evidence of the crimes alleged herein.[15]

The trial court held a bench trial on stipulated facts at which it admitted the two videotapes. It found Johnson guilty, sentenced him to 320 days in jail, and required him to register as a sex offender. The jail time was within the standard range, but the registration requirement was not. In support of the registration requirement, the trial court found "particular vulnerability" because the child shown in the videotape was "asleep during the commission of the act."[16]

## I

The first issue is whether the trial court erred by denying Johnson's motion to suppress. We consider whether the

---

[15] Clerk's Papers at 41-42, 42-43.

[16] Clerk's Papers at 92.

police were authorized to seize and view the two videotapes (A) by the warrant; (B) by severability or plain view; or (C) by consent.

## A

■■■ The first question is whether the warrant authorized the police to seize and view the two videotapes. The Fourth Amendment provides that "no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."[17] " '[P]robable cause [to search] requires a nexus between criminal activity and the item to be seized, and also a nexus between the item to be seized and the place to be searched.' "[18] As a consequence, the affidavit supporting a search warrant must contain facts from which to infer (a) that the item to be seized is probably evidence of a crime, and (b) that the item to be seized will probably be in the place to be searched when the search occurs.[19]

These requirements cannot be met merely by showing that a person probably lives in a particular place; that the person is probably involved in criminal activity of a particular type; and that the affiant officer knows, from training and experience, that persons involved in such criminal activity often keep contraband or other evidence in their homes.[20] In *State v. Thein*, for example, a police officer authored an affidavit for a search warrant. He stated that Thein lived at a particular home and was probably a drug

---

[17] U.S. Const. amend IV; *State v. Perrone*, 119 Wn.2d 538, 545, 834 P.2d 611 (1992).

[18] *State v. Thein*, 138 Wn.2d 133, 140, 977 P.2d 582 (1999) (quoting *State v. Goble*, 88 Wn. App. 503, 509, 945 P.2d 263 (1997)).

[19] *Thein*, 138 Wn.2d at 140; *State v. Cole*, 128 Wn.2d 262, 286, 906 P.2d 925 (1995); *State v. Dalton*, 73 Wn. App. 132, 136, 868 P.2d 873 (1994).

[20] *Thein*, 138 Wn.2d at 148; *Goble*, 88 Wn. App. at 511-12; *State v. Olson*, 73 Wn. App. 348, 357, 869 P.2d 110, *review denied*, 124 Wn.2d 1029 (1994); *Dalton*, 73 Wn. App. at 138; *State v. Rangitsch*, 40 Wn. App. 771, 780, 700 P.2d 382 (1985).

dealer.[21] He also stated:

> "Based on my experience and training, as well as the corporate knowledge and experience of other fellow law enforcement officers, I am aware that it is generally a common practice for drug traffickers to store at least a portion of their drug inventory and drug related paraphernalia in their common residences. It is generally a common practice for drug traffickers to maintain in their residences records relating to drug trafficking activities, including records maintained on personal computers. . . . Moreover, it is generally a common practice for traffickers to conceal at their residences large sums of money, either the proceeds of drug sales or [proceeds] to [be] utilized to purchase controlled substances. . . .
>
> I know from previous training and experiences that it is common practice for drug traffickers to maintain firearms, other weapons and ammunition in their residences for the purpose of protecting their drug inventory and drug proceeds[.]"[22]

A magistrate issued the requested search warrant, the police found drugs, and the State filed a charge. The defendant moved to suppress, arguing that even if the affidavit showed probable cause to believe he was illegally dealing drugs, the affidavit did not show probable cause to believe he had evidence of such activity in his home. The State responded "that a nexus is established between the items to be seized and the place to be searched where there is sufficient evidence to believe a suspect is probably involved in drug dealing and the suspect resides at the place to be searched";[23] thus, "if the magistrate determines a person is probably a drug dealer, then a finding of probable cause to search that person's residence automatically follows."[24] Squarely rejecting this position, the Supreme

---

[21] *State v. Thein*, 138 Wn.2d 133, 977 P.2d 582 (1999). The *Thein* court found it unnecessary to "address Thein's argument that police did not have cause to believe he was probably a drug dealer." *Thein*, 138 Wn.2d at 140 n.2. Necessarily then, it assumed that the police had such cause.

[22] *Thein*, 138 Wn.2d at 138-39 (last alteration in original).

[23] *Thein*, 138 Wn.2d at 141.

[24] *Thein*, 138 Wn.2d at 141.

Court concluded that "general statements regarding the common habits of drug dealers [are] not alone sufficient to establish probable cause[,]"[25] and that "the generalized statements contained in the affidavits in this case were, standing alone, insufficient to establish probable cause to search Thein's Austin Street residence."[26]

In the case now before us, the affidavit for the search warrant contained probable cause to believe that Johnson had committed child rape or child molestation; that a vibrating massager was evidence of the crimes; and that the massager would probably be found in his home. The affidavit did not contain probable cause to believe that the other listed items (e.g., magazines, books, movies, photographs, correspondence, diaries, tape recordings, sexual aids other than the massager) constituted evidence of the crimes. Nor did it contain probable cause to believe that the other listed items would probably be found in his home. On the contrary, as to items other than the massager, it contained only "general statements regarding the common habits of" child abusers, which are "not alone sufficient to establish probable cause."[27] Assuming without holding that the warrant authorized the police to search for and seize the massager, it did not authorize the police to search for, seize, or view the two videotapes.

## B

The parties frame the next question in terms of the warrant's severability. Johnson claims the warrant was nonseverable—i.e., invalid as to all items including the massager. The State claims the warrant was severable—i.e., valid as to the massager but invalid as to other items. Both rely on *State v. Perrone*.[28]

---

[25] *Thein*, 138 Wn.2d at 151.

[26] *Thein*, 138 Wn.2d at 148.

[27] *Thein*, 138 Wn.2d at 151.

[28] 119 Wn.2d 538, 834 P.2d 611 (1992).

We prefer to assume severability and analyze plain view. If the warrant was invalid as to all items, it did not justify seizing or viewing the two videotapes. If the warrant was invalid only as to items other than the massager, it still did not justify seizing or viewing the videotapes—unless the evidential nature of those tapes appeared in plain view during a search for the massager. We turn, then, to whether the evidential nature of the two videotapes was "in plain view" as the police searched for the massager.

 The plain view doctrine allows officers to seize an item, without a warrant,[29] if, while acting in the scope of an otherwise authorized search, they acquire probable cause to believe the item is evidence of a crime.[30] The doctrine does not allow an additional, unauthorized search,[31] a restriction usually expressed by saying that the officers must have "immediate knowledge . . . they [have] incriminating evidence before them."[32]

*Arizona v. Hicks* and *State v. Murray* exemplify cases in which officers conduct an additional unauthorized search. In each of those cases, officers were lawfully in the defendant's home. They saw an item that they suspected was stolen (a stereo in *Hicks*, a TV in *Murray*), but they lacked probable cause to believe it was stolen. To acquire probable cause, they moved the item until its serial number became visible; copied the serial number; and compared the serial number to their stolen property reports. The plain view doctrine did not justify their conduct because when they first saw the item they lacked "immediate knowledge"

---

[29] *State v. Lair*, 95 Wn.2d 706, 715-16, 630 P.2d 427 (1981) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 465-66, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971)).

[30] *Lair*, 95 Wn.2d at 715-16 (quoting *Coolidge*, 403 U.S. at 465-66); *State v. Dimmer*, 7 Wn. App. 31, 33, 497 P.2d 613, *review denied*, 81 Wn.2d 1003 (1972). *See also State v. Bustamante-Davila*, 138 Wn.2d 964, 982, 983 P.2d 590 (1999); *State v. Chambers*, 88 Wn. App. 640, 645, 945 P.2d 1172 (1997).

[31] *Arizona v. Hicks*, 480 U.S. 321, 325, 107 S. Ct. 1149, 94 L. Ed. 2d 347 (1987); *State v. Murray*, 84 Wn.2d 527, 534, 527 P.2d 1303 (1974), *cert. denied*, 421 U.S. 1004 (1975).

[32] *Murray*, 84 Wn.2d at 534; *Dimmer*, 7 Wn. App. at 33. *See also State v. Hudson*, 124 Wn.2d 107, 114, 874 P.2d 160 (1994); *State v. Gocken*, 71 Wn. App. 267, 278, 857 P.2d 1074 (1993), *review denied*, 123 Wn.2d 1024 (1994).

(probable cause to believe) that the item was evidence; and when they moved the item to acquire probable cause, they conducted an additional unauthorized search.[33]

■ *Ross v. Maryland*[34] applied these principles to a videotape. A juvenile claimed he had been invited into the defendant's bedroom, shown pornographic magazines, and molested. The police obtained and served a warrant to search the defendant's home for the magazines. During the search, the police came across a video cassette recorder and nine videotapes. As here, the exterior of the tapes did not indicate that the tapes might be evidence of a crime. Nonetheless, the police inserted one of the tapes into the recorder, viewed it, and discovered child pornography. The plain view doctrine did not justify their conduct because when they came across the videotape they did not have immediate knowledge (probable cause to believe) it was evidence of a crime; and when they viewed it to acquire probable cause, they engaged in an additional unauthorized search.

This case is like *Hicks, Murray,* and *Ross,* assuming the warrant was severable. Pea-Schuman and Oman were in possession of the massager before they saw the videotapes in issue here; but, even if they were not, they could not reasonably have thought they would find a massager inside a videotape. When they first saw the tapes, nothing about the exterior of the tapes gave probable cause to believe the tapes were evidence of a crime. To acquire probable cause, they needed to view the tapes' contents, and doing that was an additional unauthorized search. Even if the warrant was severable, so that it authorized a search for the massager, it has no bearing on the seizure and viewing of the videotapes.

## C

■ Consent is the remaining question with respect to the

---

[33] *Arizona v. Hicks,* 480 U.S. 321, 325, 107 S. Ct. 1149, 94 L. Ed. 2d 347 (1987); *State v. Murray,* 84 Wn.2d 527, 534, 527 P.2d 1303 (1974), *cert. denied,* 421 U.S. 1004 (1975).

[34] *Ross v. Maryland,* 59 Md. App. 251, 475 A.2d 481, *cert. denied,* 301 Md. 177, 482 A.2d 502 (1984).

motion to suppress. Consent must be voluntarily given.[35] Before *State v. Ferrier*, voluntariness depended on the totality of the circumstances,[36] and no one factor was dispositive.[37] When voluntarily given, consent supplanted both probable cause and the need for a warrant.[38]

In this case, the trial court found that Johnson's consent was voluntary. That finding is supported by substantial evidence.[39] For two reasons, however, Johnson claims that his otherwise-voluntary consent was vitiated.

1

■ Johnson argues that his consent was vitiated because the officers did not reveal they already had a warrant. An officer serving a search warrant is not required to seek consent to enter,[40] but he or she is permitted to do so in order to minimize violence, protect privacy, and prevent property damage.[41] When necessary to accomplish these goals, an officer may even lie to obtain consent.[42] The

---

[35] *Schneckloth v. Bustamonte*, 412 U.S. 218, 248, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973); *Bustamante-Davila*, 138 Wn.2d at 981; *State v. McCrorey*, 70 Wn. App. 103, 108, 851 P.2d 1234, *review denied*, 122 Wn.2d 1013 (1993).

[36] *State v. Smith*, 115 Wn.2d 775, 789, 801 P.2d 975 (1990); *State v. Shoemaker*, 85 Wn.2d 207, 211-12, 533 P.2d 123 (1975); *McCrorey*, 70 Wn. App. at 111; *Schneckloth*, 412 U.S. at 249; *see Bustamante-Davila*, 138 Wn.2d at 981.

[37] *Bustamante-Davila*, 138 Wn.2d at 982; *Smith*, 115 Wn.2d at 789.

[38] *State v. Ladson*, 138 Wn.2d 343, 349, 979 P.2d 833 (1999) (consent is an exception to the warrant requirement); *State v. Mathe*, 35 Wn. App. 572, 576, 668 P.2d 599 (1983).

[39] *See State v. Hill*, 123 Wn.2d 641, 647, 870 P.2d 313 (1994).

[40] *State v. Alldredge*, 73 Wn. App. 171, 178-79, 868 P.2d 183 (1994); *see State v. Myers*, 102 Wn.2d 548, 554-55, 689 P.2d 38 (1984).

[41] *Myers*, 102 Wn.2d at 554 ("a ruse entry, especially when the deception is not realized until after the entry has been accomplished, actually promotes both the purpose of preventing violent confrontation between the officer and a surprised occupant and that of preventing unnecessary property damage"); *see also State v. Garcia-Hernandez*, 67 Wn. App. 492, 496, 837 P.2d 624 (1992); *State v. Richards*, 87 Wn. App. 285, 289, 941 P.2d 710 (1997); *State v. Schimpf*, 82 Wn. App. 61, 63, 914 P.2d 1206, *review denied*, 130 Wn.2d 1005 (1996).

[42] *Myers*, 102 Wn.2d at 555; *State v. Nedergard*, 51 Wn. App. 304, 307-08, 753 P.2d 526 (1988); *State v. Hashman*, 46 Wn. App. 211, 214, 729 P.2d 651 (1986).

officers here were permitted to seek consent, and the fact they had a warrant did not affect consent so long as consent was otherwise voluntary.

## 2

Johnson argues that his consent was vitiated because the officers failed to comply with *Ferrier*.[43] In *Ferrier*, an informant told officers that Ferrier was growing marijuana in her house. The officers lacked facts from which to infer the informant's veracity, so they also lacked probable cause to arrest Ferrier or search her house.[44] Notwithstanding this deficiency, four officers went to her house to conduct a "knock-and-talk." All four were armed and wore black raid jackets with "police" emblazoned across the front. When they arrived at her house, some went to the front and some to the back. Those at the front knocked, and she came to the door. They identified themselves, and she invited them into the living room. When all four were in the living room, they confronted her with the unverified information that she was growing marijuana, and they asked if she would consent to a search of the house. They did not have probable cause to arrest; they did not tell her she had the right to refuse consent, limit consent, or revoke consent; and they did not give *Miranda* warnings. She signed a written consent form, and they found marijuana. Based on Article I, Section 7 of the Washington Constitution, the Washington Supreme Court held that the situation was "inherently coercive,"[45] and that the officers were required to mitigate coercion by advising Ferrier of her right to refuse consent, her right to limit consent, and her right to revoke consent.[46] The officers had not done that, so the marijuana was suppressed.

---

[43] 136 Wn.2d 103, 960 P.2d 927 (1998).

[44] *See State v. Jackson*, 102 Wn.2d 432, 437, 688 P.2d 136 (1984) (probable cause has two prongs: personal knowledge and veracity).

[45] *Ferrier*, 136 Wn.2d at 115.

[46] *Ferrier*, 136 Wn.2d at 118.

■ The issue here is whether *Ferrier* applies, as opposed to whether *Ferrier* was met. If *Ferrier* applies, it was not met, for the officers failed to advise Johnson of his right to limit consent and of his right to revoke consent. Their failure is understandable, for they were acting on December 4, 1997 and *Ferrier* was not decided until August 27, 1998.[47]

The Washington Supreme Court has "limited *Ferrier* to the kind of coercive searches the police employed there."[48] Accordingly, it applies only to situations in which the police employ a "knock-and-talk" procedure,[49] which the Supreme Court has defined as follows:

> In a "knock-and-talk" procedure, not having obtained a warrant, police officers proceed to premises where they believe contraband will be found. Once there they knock on the door and talk with the resident, asking if they may enter. After being allowed to enter, the officers then explain why they are there, that they have no search warrant, and ask permission to search the premises.[50]

This limitation on *Ferrier* has several specific effects. In *State v. Williams* and *State v. Bustamante-Davila*, the Supreme Court held that *Ferrier* does not apply when officers have an arrest warrant[51] or in good faith believe they have an arrest warrant.[52] In the same two cases, the

---

[47] The State does not claim that *Ferrier* applies prospectively only. Nor could it do so successfully. As a general rule, a new constitutional holding applies on direct appeal even though the events in issue occurred before the holding was announced. *State v. McCormack*, 117 Wn.2d 141, 145, 812 P.2d 483 (1991), *cert. denied*, 502 U.S. 1111 (1992); *see also United States v. Johnson*, 457 U.S. 537, 102 S. Ct. 2579, 73 L. Ed. 2d 202 (1982); *State v. Counts*, 99 Wn.2d 54, 58, 659 P.2d 1087 (1983); *State v. Rodriguez*, 65 Wn. App. 409, 417, 828 P.2d 636, *review denied*, 119 Wn.2d 1019 (1992).

[48] *State v. Williams*, 142 Wn.2d 17, 26, 11 P.3d 714 (2000).

[49] *Bustamante-Davila*, 138 Wn.2d at 980.

[50] *Bustamante-Davila*, 138 Wn.2d at 976-77 (footnotes omitted).

[51] *State v. Williams*, 142 Wn.2d 17, 27, 11 P.3d 714 (2000).

[52] *State v. Bustamante-Davila*, 138 Wn.2d 964, 984, 983 P.2d 590 (1999) (local officers "in good faith believed [that INS agent] had a valid deportation order issued by an immigration judge").

court stated in dictum that *Ferrier* does not apply when officers have a search warrant.[53]

In this case, the officers went to Johnson's home with probable cause to arrest;[54] in contrast to the officers in *Ferrier*, they were not pursuing unverified information from an informant who was not known to be reliable. They had a search warrant, issued by a neutral and detached magistrate, even though it later turned out to be wholly or partially invalid. There is no finding that they knew the search warrant was wholly or partially invalid, or that they were acting in bad faith. Indeed, they appear to have been acting in good faith, for they scrupulously advised Johnson of his right to refuse consent and—several times—of his *Miranda* rights. We conclude that *Ferrier* does not apply under these circumstances; that Johnson's consent was voluntary and thus valid; and that the motion to suppress was rightly denied.

## II

█ Relying on *State v. Chester*,[55] Johnson argues the stipulated facts are insufficient to support his conviction. Relying on *State v. Myers*,[56] the State disagrees. Johnson acknowledges that he fondled a child's genital area while making the pictures that he was convicted of possessing. This case is like *Myers*, not *Chester*, and the evidence is sufficient.

---

[53] *See Williams*, 142 Wn.2d at 28; *Bustamante-Davila*, 138 Wn.2d at 976. Although *Williams* did not involve a search warrant, the court commented, "[W]e limit the requirement of a warning [under *Ferrier*] to situations where police seek to conduct a search for contraband or evidence of a crime without obtaining a search warrant." *Williams*, 142 Wn.2d at 28. Although *Bustamante-Davila* did not involve a search warrant, the court commented that *Ferrier* was limited to the "knock-and-talk" procedure, and that the knock-and-talk procedure was one in which the police sought to search without obtaining a warrant. *Bustamante-Davila*, 138 Wn.2d at 976.

[54] CL and DL had personal knowledge, and their veracity was inferable from the circumstances. In addition, their statements were corroborated by physical examinations.

[55] *State v. Chester*, 133 Wn.2d 15, 940 P.2d 1374 (1997).

[56] *State v. Myers*, 133 Wn.2d 26, 941 P.2d 1102 (1997).

### III

■ Johnson argues that the trial court unlawfully required him to register as a sex offender. Even an exceptional sentence must be authorized by statute.[57] By the plain terms of RCW 9A.44.130, sex-offender registration may be required only for a sex offense.[58] Johnson was not convicted of a sex offense, because the statutory definition of "sex offense" does not include unlawfully possessing pictures in violation of RCW 9.68A.070.[59] The trial court lacked statutory authority to require sex offender registration, and that part of the sentence is stricken.

Johnson's remaining arguments need not be reached or obviously lack merit.

We remand to the trial court with instructions to strike the registration requirement. In all other respects, we affirm.

BRIDGEWATER, J., and WANG, J. Pro Tem., concur.

---

[57] *See State v. Guerin*, 63 Wn. App. 117, 121, 816 P.2d 1249 (1991), *review denied*, 118 Wn.2d 1015 (1992) (trial court lacked statutory authority to impose community placement); *State v. Skillman*, 60 Wn. App. 837, 838, 809 P.2d 756 (1991) (similar). For precisely this reason, a trial court may not impose either a standard or exceptional sentence that exceeds the statutory maximum term. *See* RCW 9.94A.120(13).

[58] *See Oostra v. Holstine*, 86 Wn. App. 536, 546, 937 P.2d 195 (1997), *review denied*, 133 Wn.2d 1034 (1998) (no statutory authority to require registration in civil proceeding involving sexual abuse).

