[No. 871-3.   Division Three.   July 2, 1975.]

THE STATE OF WASHINGTON, *Respondent*, v. SHARON KEEFE, *Appellant.*

*David A. Thorner* (of *Weeks, Buren & Thorner*), for appellant.

*Jeffrey C. Sullivan, Prosecuting Attorney*, for respondent.

WILLIS, J.*—The defendant-appellant, Sharon Keefe, and her husband, now deceased, were charged with possession of identification card reproduction equipment in count 1 and with first-degree forgery of an identification card in count 2. At trial, count 1 was dismissed. The jury returned a guilty verdict as to count 2.

A short statement of the relevant facts is as follows: On August 17, 1972, one Kenneth Knight reported to the Yakima County Sheriff's office that a gun had been stolen from him in a burglary; that pursuant to an advertisement in a local newspaper, he had gone to a house at 205 South Fourth Street, Yakima (the Keefe residence), where the

---

*Judge Robert J. Willis is serving as a judge pro tempore of the Court of Appeals pursuant to Laws of 1973, ch. 114.

gun was shown and offered for sale to him. He recognized the gun as his property, identifying it by its broken left grip and its serial number. He did not purchase the gun.

Thereafter, an affidavit for search warrant was executed by Mr. Knight and two police officers, which stated, among other things, that the residence at 205 South Fourth Street was occupied by Mr. Keefe, "reputed to be a dealer in stolen property in the Yakima area." Based on said affidavit, a search warrant was issued and served on the Keefes at their residence by six police and sheriff's officers. The search warrant authorized only the seizure of the gun belonging to Mr. Knight.

The search warrant was read to Mr. and Mrs. Keefe in the living room by Police Officer Wentz and they promptly produced and delivered to the officers the gun mentioned in the warrant. One of the other officers, Deputy Sheriff Molineux, had entered the house by the back door and proceeded through the kitchen and a hallway to a position near the front door. While standing in the hallway, he could see into an adjoining room which he identified as "the office" where he observed an electric typewriter on a stand or table.

Prior to arriving at the Keefe residence, the officers discussed the possibility of Mr. Keefe's involvement in a forgery ring in which a typewriter, with distinctive "e" and "i" characters, was being used. Deputy Molineux testified that he was surprised to see the typewriter in Mr. Keefe's office, but was not suspicious about it. Nevertheless, he entered the room, turned on the typewriter and took two samples of its "e" and "i" characters on a corner of a newspaper that he found there.

Shortly after leaving the Keefe premises, Deputy Molineux conferred with Police Officer Burnam who had been investigating the forged documents bearing distinctive "e" and "i" characters. Upon comparison with the sample taken by Deputy Molineux from the Keefe typewriter, they concluded that it was the machine that had produced the

forged documents under investigation. They thereupon executed an affidavit for search warrant and obtained a warrant authorizing a search of the Keefe premises for the typewriter and typewritten blank or partially completed forms of the several types of documents similar to those in the possession of the police. The second search warrant was served on the Keefes later the same day and the typewriter and many of the described documents were seized.

Prior to the trial of this action, a motion was made on behalf of the Keefes to suppress the articles taken from the Keefe home during the execution of the second search warrant, on the ground that such articles were obtained pursuant to an unreasonable search and seizure. A pre-trial hearing was held and the motion denied. Such motion was renewed during the trial and was again denied. As previously indicated, the jury found the defendant guilty of the offense charged in count 2.

Although the defendant makes several assignments of error, the resolution of the first such assignment is determinative of this appeal, namely, that the court erred in failing to suppress all physical evidence seized at appellant's residence, except the gun.

The State concedes that its case against the defendant rests entirely upon the evidence taken from her residence by authority of the second search warrant. It becomes necessary, therefore, to determine whether there was an unreasonable search and seizure under the first search warrant because it was only during its execution that evidence sufficient to constitute probable cause for the issuance of the second warrant was obtained.

Under the authority of the first search warrant, the officers were only entitled to search for and obtain the gun described in the warrant which was delivered to them by Mr. Keefe within 5 minutes of their arrival. The warrant did not authorize a search of the premises for evidence of other crimes.

There is an exception to the general rule that

searches may not be conducted without a warrant or outside the scope of a warrant. This is known as the "plain view" doctrine which is enunciated in the leading case of *Coolidge v. New Hampshire*, 403 U.S. 443, 29 L. Ed. 2d 564, 91 S. Ct. 2022 (1971). In that decision, the Supreme Court of the United States held that an officer lawfully on a defendant's premises need not close his eyes to evidence of a crime or a person's involvement in criminal activity if such evidence inadvertently comes into his "plain view." The court stated, however, that there are three essential safeguard requirements that must be present to justify a "plain view" seizure. They are: (1) a prior justification for intrusion; (2) an inadvertent discovery of incriminating evidence; and (3) immediate knowledge by the police that they have evidence before them.

In the instant case, Deputy Molineux had a right to be where he was in the hallway near the front door, because he had gone there for "security purposes," or, in other words, to determine that there was no other person, armed or unarmed, in that part of the house who might constitute a threat to the safety of the officers. (The other officers were in the living room with the Keefes, where the search warrant was read and the gun was delivered to the officers.) However, when Deputy Molineux looked through the "office" door and saw the typewriter, he had no right to enter that room, where no one else was present, to take samples of the "e" and "i" letters of the typewriter. It must be remembered that the warrant authorized only the seizure of the described gun, and the operation of the typewriter in no way furthered that objective.

The officer testified that he was *surprised* to see the typewriter in the Keefe home but that he was not *suspicious* of it. At any rate, even if he had been suspicious of it, he legally could not have taken the type samples because his view of the typewriter in no way could have established either (1) that it had produced forged documents, or (2) that it contained unique and distinctive "e" and "i" type characters. If it contained the unique "e" and "i" letters,

then it did constitute evidence concerning the commission of another crime; if it did not have such letters, it did not constitute such evidence. The most that can be said for the officer's view of the typewriter, as respondent's counsel stated in oral argument, is that an item of *possible* evidentiary value came within the officer's "plain view."

Thus, both the second and third requirements, but particularly the third requirement, for the application of the "plain view" doctrine are lacking. The officer made the inadvertent discovery of a typewriter, but without taking the type samples he had not discovered incriminating evidence; and, more importantly, he did not have immediate knowledge that he had evidence before him. He could not have such knowledge without the type samples; and without such knowledge he had no legal right to carry the search further. As the court stated in *Coolidge*, at page 466:

> [T]he extension of the original justification is legitimate only where it is immediately apparent to the police that they have evidence before them; the "plain view" doctrine may not be used to extend a general exploratory search from one object to another until something incriminating at last emerges.

We believe that this case is controlled by the rule of *State v. Murray*, 8 Wn. App. 944, 509 P.2d 1003 (1973), *aff'd*, 84 Wn.2d 527, 527 P.2d 1303 (1974), *cert. denied*, ........ U.S. ........, 44 L. Ed. 2d 673, 95 S. Ct. 2407. In that case the police were given permission to search the defendant's premises for video and office equipment. On the way out after an unsuccessful search, an officer noted the serial number of an ordinary television set located in the living room of the apartment, although he had no reason to believe that there was anything suspect about it. Upon checking further, it was found that the television set was a stolen article. The court held that the serial number was taken outside the scope of the warrant and ordered it suppressed as fruit of the unlawful search.

To like effect is *United States v. Langley*, 466 F.2d 27, 34 (6th Cir. 1972), where officers were called to the defend-

ant's home by a report that it was being burglarized. One of the officers entered the back of a truck parked in the driveway and noted markings on several large crates inside the truck. The police had no knowledge that there was anything unusual about either the truck or the crates. The court held that the officer's entry into the truck and the copying of the markings was "a step beyond that which was sanctioned by the circumstances . . ."

The respondent contends that the holdings in *State v. Dimmer*, 7 Wn. App. 31, 497 P.2d 613 (1972); and *State v. Proctor*, 12 Wn. App. 274, 529 P.2d 472 (1975), support its position that the search which produced the offending typewriter in this case was entirely proper and lawful. We believe, however, that those cases are clearly distinguishable. In *Dimmer*, it was held that officers executing a warrant directing a search for "narcotic or dangerous drugs," were entitled to seize prescription bottles bearing defendant's name which came into plain view in the same room in which heroin was found. The court observed that the prescription bottles had evidentiary value tending to establish the defendant's constructive possession of the room.

In *Proctor*, a police officer, late in the evening, responded to an alarm that was sounding in the defendant's real estate office. He found the basement door open, no one inside, but discovered that the office contained a great deal of office equipment and other items, including an outboard motor, two movie projectors, six radios and three calculators. Having previous information that the defendant engaged in selling and storing stolen property, the officer copied the serial numbers of the calculators. A later check disclosed that the calculators were stolen property. A search warrant was obtained and the calculators were seized. The defendant's motion to suppress the evidence was denied. In affirming the trial court's decision, the court distinguished *Murray* and *Langley*, stating:

The information which the police had about Proctor, *coupled with the incongruity of the items seen in the business office*, gave the officer probable cause to believe that

he was looking at stolen property. It was reasonable for him to note the serial numbers.

(Italics ours.) *State v. Proctor, supra* at 277.

Although the officers in the instant case did have prior information that Mr. Keefe might have been involved in a forgery ring, there was no incongruity in the presence of a typewriter in a private home, and there was no immediate knowledge by Deputy Molineux, upon seeing the typewriter, that it had been used in a forgery operation. Since knowledge that it was in fact the machine which produced the forged instruments could not be known until samples of its "e" and "i" letters had been taken, the portion of the search which extended to the taking of such samples, under a search warrant which authorized only the seizure of a gun, was entirely unjustified and without legal sanction.

As the court noted in *Proctor*, at pages 276-77:

[P]olice who are rightfully upon a citizen's property for a limited purpose may not rummage about in the hope or expectation that incriminating evidence or contraband will turn up.

The "plain view" doctrine, enunciated in *Coolidge* and approved in *Dimmer*, has no application in this case.

■ Our Supreme Court has adopted the "fruit of the poisonous tree" doctrine, which holds that any evidence produced as the "fruit" of an unlawful search is not admissible in evidence and will not support a conviction. *McNear v. Rhay*, 65 Wn.2d 530, 398 P.2d 732 (1965); *State v. O'Bremski*, 70 Wn.2d 425, 423 P.2d 530 (1967).

It might be said in this case that the items taken in the second search speak loudly of the defendant's guilt and that, therefore, although improperly and illegally obtained, her conviction should be allowed to stand. Such reasoning, however, would be destructive of the defendant's basic constitutional rights and would encourage or at least invite our peace officers to use illegal means in establishing a case against any suspected lawbreaker. Such practices would not only tend to undermine the integrity of our law officers, but would also contribute toward an erosion of one of the

freedoms that we as Americans hold most dear, the right to be secure in our homes.

The defendant has been convicted on the strength of illegally obtained evidence, without which no case can be established against her. Therefore, the conviction is set aside and the charge against the defendant is dismissed.

McINTURFF, C.J., and GREEN, J., concur.

Petition for rehearing denied August 11, 1975.

Review denied by Supreme Court October 7, 1975.