[No. 2680–3.   Division Three.   June 29, 1978.]

THE STATE OF WASHINGTON, *Respondent*, v. KENNETH CHRIS LEGAS, *Appellant*.

*F. Curtis Hilton,* for appellant (appointed counsel for appeal).

*Don Herron, Prosecuting Attorney,* and *Joseph D. Mladinov, Senior Deputy,* for respondent.

ROE, J.—The victim of a motorcycle theft traced his stolen bike to a private garage. He admitted trespassing on private property in order to stand on a wooden block and press his nose to a glass window to verify that his bike indeed was there. He then had one of his friends call the sheriff while he stood guard. When the officer came, he apparently also trespassed to verify what the victim told him. Having done so, he left to obtain a search warrant. His affidavit recited: that the victim had reported the stolen bike and described its unusual features, including a custom paint job and an extra headlight; that the officer had seen the bike's legal registration; that the victim informant had

been checked out and found to have had no criminal record; and that the bike was in fact in the garage. The affidavit further reported that the officer had gone to the garage and verified the bike's presence from the description. A search warrant was issued directing a search of the garage to seize the bike, and of the adjacent house to find "bills, papers, receipts, and other documents bearing the address to be searched and naming the occupants." This latter evidence was sought so that defendant could be connected with the stolen bike. The prosecutor was correctly anticipating a defense that defendant did not live there and hence was not in possession of stolen property.

The search was performed pursuant to the warrant. Defendant's estranged wife returned home while the officers were conducting their search, and she then consented to the search as well. Defendant was charged with grand larceny by possession of the bike, which had been found in the garage. As a result of the evidence obtained in the house, defendant was also charged with and convicted of five other counts of grand larceny of property found therein: (1) a credit card belonging to Ristine; (2) a keycutter, decoder and key blanks belonging to Temple Motors; (3) radio equipment, belonging to Smith, which had been modified and from which some serial numbers were missing; (4) a sewing machine belonging to Johannes, and (5) radio equipment belonging to Perozzo from which the serial and call numbers had been effaced.

Even though defendant conceded during the trial that the officers had a right to seize the bike, he now assigns various errors, namely:

1. That the officer's trespass to view the bike in the garage was an unconstitutional invasion of defendant's right of privacy so that all evidence found therein should be suppressed;

2. That the warrant authorizing the search of the house was unconstitutionally overbroad;

3. That all evidence found in the house should have been suppressed; and

4. That evidence of serial numbers, or absence thereof, from radio equipment in the house was illegally obtained and should have been suppressed.

We have chosen to discuss the admissibility of each individual item rather than to consider this case in light of the defense submitted at trial. Mrs. Legas, defendant's wife, stated at the trial that she and her husband were estranged and that he had not been living in the house for about a week prior to the search. She also stated that the radio equipment had been brought there by her boyfriend. Defendant never claimed a proprietary or possessory interest in the premises; however, we do not reach the issue of whether defendant had standing to question the legality of the search of premises over which his defense was he had no dominion or control. *See State v. Kearney,* 75 Wn.2d 168, 172, 449 P.2d 400 (1969).

■ Turning to defendant's first assignment of error, it is clear from the substance of the affidavit supporting the warrant that this search warrant was based upon the evidence which the victim furnished to the officer. The victim may have trespassed to obtain his information; nevertheless, it is well known that the Fourth Amendment's protection against unlawful searches and seizures applies only to governmental action. The origin and history of the Fourth Amendment clearly shows that it was intended as a restraint upon the activities of sovereign authority, and was not intended to be a limitation other than upon governmental agencies. *See Burdeau v. McDowell,* 256 U.S. 465, 475, 65 L. Ed. 1048, 1051, 41 S. Ct. 574, 13 A.L.R. 1159 (1921); *State v. Wolfe,* 5 Wn. App. 153, 486 P.2d 1143 (1971).

■ Here, the officer, looked into the garage window only after the citizen victim had identified the vehicle as being stolen and as being his.

Evidence obtained during an illegal search does not make unusable the same evidence previously gained from an independent source. *State v. O'Bremski,* 70 Wn.2d 425, 423 P.2d 530 (1967).

*State v. York,* 11 Wn. App. 137, 139, 521 P.2d 950 (1974). *York* involved a warrantless search of a motel room based upon the suspicions of the motel owner and his wife, who had entered the room specifically to see what was there. Having done so, they contacted the police, who entered the room, searched it, and obtained a serial number from a television set. This court held that the warrantless search was not supported by probable cause because the information obtained from the motel owner and his wife never rose above mere suspicion; thus, the officers had no knowledge that the property in the motel room was indeed stolen. Such mere suspicion "is an inadequate basis for the introduction of evidence found during an illegal search." *State v. York, supra* at 140–41. This case is unlike *York;* here, the citizen informant provided detailed information by describing the bike's several unusual features and by showing his valid registration for it. The victim had already, earlier the same day, reported his bike stolen, and he credibly insisted that he knew it was in that very garage. Such evidence clearly rises above the level of mere suspicion; the officer's subsequent intrusion onto private property to verify the victim's statements does not, therefore, vitiate the search warrant or the admissibility of the evidence.

In light of our disposition of this issue, we need not discuss those cases which hold that, while such an entry by a police officer may be a civil or technical trespass, it is not an *unreasonable* search such as to require suppression of the evidence. Where such an intrusion was merely a technical trespass and was not a general exploratory search, it should more accurately be considered as merely an inspection to verify the information. *See Giacona v. United States,* 257 F.2d 450 (5th Cir. 1958), *cert. denied,* 358 U.S. 873, 3 L. Ed. 2d 104, 79 S. Ct. 113 (1958); *United States v. Johnson,* 561 F.2d 832 (D.C. Cir. 1977).

The exclusionary rule was adopted as an administrative procedure to deter police conduct which violates the Fourth Amendment. A private individual's acts might violate the Fourth Amendment if they were done by a policeman, but

540

in situations such as this, police conduct is not involved. To exclude this evidence on the ground that the victim trespassed on private property would not be a deterrent on police activity; hence, there is no reason to exclude the evidence. *State v. McFarland,* 84 Wn.2d 391, 393, 526 P.2d 361 (1974).

■ Defendant's second assignment of error is that the warrant was overbroad. *State v. Smith,* 16 Wn. App. 425, 558 P.2d 265 (1976), *review denied,* 88 Wn.2d 1011 (1977), involved a former lawyer who was charged with grand larceny by misappropriation of trust funds. Search warrants were issued which

both sanctioned the search for documents, canceled checks, bank statements, and correspondence pertaining to the guardianship accounts in question.

*State v. Smith, supra* at 428. Defendant's challenge that the warrants were overbroad was dismissed as being without merit. In the instant case defendant was charged with grand larceny by receiving and holding stolen property. To prove its case, the State must be able to establish that the defendant was entitled to possession of the premises on which the stolen property was recovered. One way to do this is to find papers, receipts, bills, or other documents bearing the address to be searched and to name any of the occupants or residents. Directing a search for such evidence did not convert the warrant into an authorization of a general exploratory search.

Defendant cites *Stanford v. Texas,* 379 U.S. 476, 13 L. Ed. 2d 431, 85 S. Ct. 506 (1965), to support his contention that the warrant was overbroad, but that case is not in point since it involved First Amendment restraints on a search for books of a suspected communist in Texas. Such restraints do not apply to papers which merely evidence ownership.

The Fourth Amendment requires a particular description of the things to be seized so that general searches may not be made and so that one thing may not be seized under a warrant describing something else. What is to be seized is

not to be left to the police officer's discretion. In *Andresen v. Maryland,* 427 U.S. 463, 49 L. Ed. 2d 627, 96 S. Ct. 2737 (1976), an attorney was accused of being involved in land fraud. The warrants exhaustively listed many particularly described documents, but included the phrase "together with other fruits, instrumentalities, and evidence of crime at this time unknown." Defendant objected that this warrant authorized a general exploratory search, but the court upheld it, saying that the phrase must be read in connection with the crime of false pretenses under a particular statute. The warrants accordingly did not authorize the police to search for evidence of other crimes, but only to search for and seize evidence relative to the crime of false pretenses. We believe that this reasoning controls the instant case. The specific nature of the items to be seized must be stated to prevent a general exploratory search, but each individual item seized need not have been specified. We find no error.

Defendant next contends that the evidence of the credit cards should have been suppressed. He is correct. While the officers properly did not confine themselves to searching the kitchen and desk drawers for the papers described in the warrant, and properly did look under the bed when their search elsewhere did not disclose the evidence they sought, they first found a briefcase containing an earnest money agreement and other documents clearly linking defendant to the premises. Having found that, they still continued their search and found a small box; they removed it from beneath the bed, opened it, and found some credit cards. Since they had already found what they sought, this exploration beneath the bed and opening the box was more in the nature of a general search than it was within the rule of the plain view doctrine that the officer must have immediate knowledge that he is looking at incriminating evidence. *Coolidge v. New Hampshire,* 403 U.S. 443, 29 L. Ed. 2d 564, 91 S. Ct. 2022, 2024 (1971), states that the:

Plain view doctrine may not be used to extend a general exploratory search from one object to another until something incriminating at last emerges.

The officers' opening the small box with the credit cards was activity beyond the scope of the warrant.

The plain view doctrine does, however, justify seizure of the radio equipment which the officers found in the kitchen. *Coolidge v. New Hampshire, supra,* requires, first, a prior justification for the intrusion; this is satisfied here because the officers were searching the house pursuant to a valid warrant. Second, the incriminating evidence must have been discovered inadvertently, which happened here because the officers had to enter the house through the kitchen, and the radio equipment was resting right there when they entered. Third, the police must know immediately that they have incriminating evidence before them; several factors coalesce to satisfy this requirement: the officers already had found the stolen motorcycle in the garage; in the house they found the victim's gloves and coat, which he had particularly described to them; thus, they knew to a moral certainty that they were in a "den of thieves"; further, there was an abnormal and unusually large amount of such radio equipment there. Still, however, the officers did not proceed to seize the radio equipment until after the briefcase was found and they knew who occupied the house. Deputy Prosecutor Loomis, who was present at the search, immediately recalled that the defendant was already a convicted felon. Based upon all of this, the officers proceeded to inspect the radio equipment and found that the serial numbers had been removed. Effacing serial numbers in itself is a crime under RCW 9A.56.180 (effective 2 months after this search was made), and would certainly be compelling evidence at any time. Such prior information as the deputy prosecutor provided gave the police additional reason to believe that they were looking at stolen property.

Defendant relies heavily upon *State v. Keefe,* 13 Wn. App. 829, 537 P.2d 795 (1975), in which officers searching pursuant to a warrant saw a typewriter on the premises.

One officer put a piece of paper in the typewriter and took samples of the letters "e" and "i." He stated that he had been surprised to see the typewriter in the defendant's home but that he was not suspicious of it. This failed to satisfy the third requirement under the plain view doctrine; the officer, even if he were suspicious, did not have immediate knowledge that incriminating evidence was before him. This knowledge came only after letter samples were taken. Defendant also cites *State v. Murray,* 8 Wn. App. 944, 509 P.2d 1003 (1973), *aff'd,* 84 Wn.2d 527, 527 P.2d 1303 (1974), in which the searching officers were let in for the limited and specific purpose of searching for video and office equipment. An officer noted a television set in the bedroom; he believed this was unusual. No other stolen property was found. He tipped the television set to copy the serial number; later, when it was discovered to have been stolen, it was seized pursuant to a warrant. In a 5-to-4 decision the Supreme Court ordered it suppressed. The record in that case was rather incomplete as to precisely what was done in order to obtain the serial number, but the court held that nothing unusual or incongruous about the set's location raised the officer's suspicions above the level of mere speculation. Likewise, in *Keefe* the typewriter's presence did not of itself indicate that a crime had been committed.

The case at bench is more closely akin to *State v. Proctor,* 12 Wn. App. 274, 529 P.2d 472 (1974), which involved officers who went to the basement of a real estate office in response to a burglar alarm. They found no one inside, but observed a great deal of office equipment and many other items, including an outboard motor, two movie projectors, and six radios. Previously an informant had told the officer that Proctor was engaged in selling and storing stolen property. The officer copied the serial numbers of three calculators and checked to see if they were stolen. They were later seized pursuant to a search warrant. The court held that the information which the police had about Proctor, coupled with the incongruity of the items seen in the

business office, gave the officer probable cause to believe that he was looking at stolen property. It was reasonable for him to note the serial numbers. We hold that this rationale governs the instant case. *See also State v. Palmer,* 5 Wn. App. 405, 487 P.2d 627 (1971).

More importantly, *Proctor* held at page 277 that

in police work, circumstances sometimes develop in which an intermediate response is appropriate. If a police officer has a "well–founded suspicion not amounting to probable cause" that a person has, is, or is about to commit a crime, that person may be detained for investigatory purposes without an arrest. . . . The temporary detention may continue while the officer questions other persons present or radios police headquarters to check the information gained. . . . A noting of the serial numbers on the calculators was such an intermediate response.

(Citations omitted.) The case does not indicate what had to be done, physically, to the calculators, *i.e.,* whether they had to be moved, tilted, or touched, to obtain the serial numbers. This reasoning also applies to the instant case. Since the police had certain knowledge that the house contained stolen property, and since they had learned that the defendant, a known felon, had resided there, an intermediate response of checking for serial numbers became appropriate. When they saw that those numbers had been obliterated, they then had knowledge that incriminating evidence was before them.

It was also proper, under the plain view doctrine and the reasoning of *Proctor,* for the police to seize the keycutter which was found in a kitchen drawer. Its being there was incongruous because such keycutters are usually limited to dealers. Further, as discussed above, the police were already certain that they were in a house full of stolen property. The officers' later return to take the keycutter guide and to seize the stolen sewing machine was proper because Mrs. Legas not only consented to but aided in the search and seizure. *See State v. Gillespie,* 18 Wn. App. 313, 569 P.2d 1174 (1977).

We note that the motion to suppress the evidence was heard by a judge other than the one who tried the case. This resulted in renewals of the motion to suppress, but the trial judge was disinclined to reconsider another judge's ruling thereon. It would seem to be better practice, as is found in some counties, to have the same judge preside at both the suppression hearing and the trial.

Defendant's conviction for credit card theft is reversed; his other convictions are affirmed.

MUNSON, C.J., and McINTURFF, J., concur.