# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 71094-0-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | |
| JUSTIN MICHAEL STOLTMAN, | ) | UNPUBLISHED |
| | ) | |
| Appellant. | ) | FILED: January 5, 2015 |
| | ) | |

COX, J. — Justin Stoltman appeals his judgment and sentence, claiming that the trial court erred when it denied his motions to suppress. Specifically, he contends that he was subjected to custodial interrogation in violation of Miranda v. Arizona,[1] and that evidence in his case was seized without probable cause. He also argues that the State's 31 month delay in filing charges violated his due process rights. Because none of these arguments are persuasive, we affirm.

In July 2010, an officer with the state Fish and Wildlife agency received information from an informant that two individuals were illegally crabbing at night. These individuals were later identified as Justin Stoltman and Tamas Hibszki, Stoltman's co-defendant.

---

[1] 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

The officer investigated the report, and a few hours later saw Stoltman and Hibszki take a boat into a landing. The officer spoke with Stoltman and Hibszki and saw a large coil of cable in the boat.

The officer asked them where the cable came from, and Hibszki said that they had taken the cable from abandoned pilings to sell as scrap metal. The officer believed that the pilings were property of the Port of Seattle and called Port of Seattle police officers, who came and seized the cable. The officer warned Stoltman and Hibszki that the boat violated state law, and he let them go without then taking further action.

The next night, the same officer received another call from the informant, who had again seen Stoltman and Hibszki. The informant told the officer that Hibszki said that he and Stoltman were going out to get more cable because the officer had seized the cable from them the prior night.

The officer and his partner took a Fish and Wildlife boat and found Stoltman and Hibszki. Stoltman and Hibszki's boat again violated Washington law by failing to have proper lights and a "noise-making system," and by failing to properly display registration. The officer pulled up next to Stoltman and Hibszki and saw a large pipe valve on the floor of their boat.

The officer asked Stoltman to board the Fish and Wildlife vessel, and Stoltman did so. The officer then asked him about the valve. Stoltman told the officer that the large pipe valve had been in the boat when he got on. After this discussion, the officer returned Stoltman to his vessel and asked Hibszki to board

2

the Fish and Wildlife vessel. After boarding, Hibszki stated that he and Stoltman had picked up the valve from some friends.

The officer then asked Stoltman to re-board the officer's vessel. After Stoltman boarded, the officer confronted Stoltman with the discrepancy in explanations about the pipe valve. Stoltman then stated that he did not want to speak with the officer anymore.

While the officer spoke with Stoltman and Hibszki, his partner obtained permission from them to search their bags and found "freshly cut pieces of copper and brass fittings" and metal handles.

The officer then cited Stoltman and Hibszki for the boating violations and seized their bags and the large valve on the floor of their boat. The officer's subsequent investigation revealed that the items were stolen from a large vessel.

The officer completed his investigation 28 months later. His investigation was delayed because he took time off work to help care for a family member's medical problems. Other members of the Fish and Wildlife division were unable to work on the officer's cases during his absence due to their own caseloads.

In 2013, the State brought charges against Stoltman and Hibszki. This was 31 months after the events giving rise to the charges. Before trial, Stoltman and Hibszki moved under CrR 3.6 to suppress the physical evidence against them, arguing that the officer lacked probable cause when he seized the evidence. Stoltman and Hibszki also moved under CrR 3.5 to suppress their statements made to the officer, arguing that they were obtained in violation of Miranda.

3

The court denied the motions after a combined CrR 3.5 and CrR 3.6 suppression hearing. A jury found Stoltman and Hibszki guilty.

Stoltman appeals.

## MOTIONS TO SUPPRESS

Stoltman argues that the trial court erroneously denied his motion to suppress the statements Stoltman made to the officer and his motion to suppress the physical evidence the officer seized. We hold that the court properly denied these motions.

Trial courts make written findings of fact and conclusions of law when deciding a motion to suppress evidence.[2] Appellate courts review challenged findings of fact for substantial evidence, and determine "whether the findings support the conclusions of law."[3] Conclusions of law are reviewed de novo.[4]

### CrR 3.5 Motion

Stoltman argues that the trial court erred when it denied his motion to suppress statements made on board the Fish and Wildlife boat. He contends that the officer obtained these statements in violation of Miranda by interrogating him without informing him of his rights. Specifically, he argues that he was "in custody," because the officer exceeded the scope of an investigatory stop when he questioned Stoltman on board the boat. We disagree.

---

[2] CrR 3.5; CrR 3.6.

[3] State v. Garvin, 166 Wn.2d 242, 249, 207 P.3d 1266 (2009).

[4] State v. Ortega, 177 Wn.2d 116, 122, 297 P.3d 57 (2013).

4

Because Stoltman implicitly concedes that the investigatory stop was proper, the question before us is whether the events that followed gave rise to the warning requirements of Miranda. That, in turn, requires a determination on whether these events elevated the stop to custody.

Miranda prohibits the State from using a defendant's statements resulting from "custodial interrogation" unless the defendant was informed of certain rights.[5] Courts presume that statements made in custody are involuntary and violate the Fifth Amendment unless the defendant received Miranda warnings.[6]

Whether the defendant was in custody is a mixed question of fact and law.[7] "The defendant must show some objective facts indicating his or her freedom of movement was restricted."[8] And the defendant is in custody if "a reasonable person in [the defendant]'s position would have felt that his or her freedom was curtailed to the degree associated with a formal arrest."[9]

When an officer briefly detains a suspect during an investigatory stop, the suspect is not in custody under Miranda.[10] The officer "'may ask a moderate

---

[5] Miranda, 384 U.S. at 444.

[6] State v. Heritage, 152 Wn.2d 210, 214, 95 P.3d 345 (2004).

[7] See In re Pers. Restraint of Cross, 180 Wn.2d 664, 681 n.7, 327 P.3d 660 (2014).

[8] State v. Post, 118 Wn.2d 596, 607, 826 P.2d 172, amended, 118 Wn.2d 596, 837 P.2d 599 (1992).

[9] Heritage, 152 Wn.2d at 218.

[10] State v. Marcum, 149 Wn. App. 894, 909-10, 205 P.3d 969 (2009).

number of questions . . . to confirm or dispel the officer's suspicions without rendering the suspect "in custody" for the purposes of Miranda.'"[11]

Washington courts analyze the scope of an investigatory stop with three factors in mind: "(1) the purpose of the stop; (2) the amount of physical intrusion upon the suspect's liberty; and (3) the length of time the suspect is detained."[12]

In Washington, an investigatory stop may include transporting a suspect a short distance.[13] Although transporting a suspect is "more intrusive than a mere stop," it is permissible as part of an investigatory stop if a crime has been reported.[14]

For example, in State v. Wheeler, a suspect was handcuffed, placed in a police car and transported two blocks for identification following the report of a burglary.[15] The suspect was detained for a total of 5 to 10 minutes.[16] In that case, the supreme court held that the suspect's detention was a part of a permissible investigatory stop rather than the equivalent of a full arrest.[17]

---

[11] Id. at 910 (emphasis omitted) (quoting Heritage, 152 Wn.2d at 218).

[12] State v. Wheeler, 108 Wn.2d 230, 235, 737 P.2d 1005 (1987).

[13] Id. at 236-37.

[14] Id. (quoting 3 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 9.2, at 26 (Supp. 1986)).

[15] 108 Wn.2d 230, 235, 737 P.2d 1005 (1987).

[16] Id. at 237.

[17] Id. at 236-37.

Here, Stoltman was not in custody under the controlling cases. Stoltman implicitly concedes that the initial stop was a valid investigatory stop. But Stoltman argues that when Stoltman boarded the Fish and Wildlife boat that was adjacent to his boat and was questioned there, the officer exceeded the scope of a valid investigatory stop by placing Stoltman in custody. Thus, the question is whether Stoltman was in custody while on the Fish and Wildlife boat.

As discussed earlier, in an investigatory stop, officers may briefly detain and question a suspect "to confirm or dispel [their] suspicions."[18] Here, that was exactly what the investigating officer did.

The officer stopped Stoltman and Hibszki to investigate the report from the informant that they were going to steal more cable. Based on prior contact with these two individuals, the officer was suspicious about the pipe valve in their possession. The prior night, they had admitted taking property, which the officer believed belonged to the Port of Seattle. Accordingly, the officer decided to question each of them about the valve in their possession. Thus, the stop's investigatory purpose was proper.

Additionally, the stop was brief. The court found that the time spent questioning both Hibszki and Stoltman was less than 15 minutes. Stoltman challenges this finding, but it is supported by substantial evidence. The officer testified that he detained Hibszki and Stoltman for a total of 25 minutes. But he

---

[18] Marcum, 149 Wn. App. at 910 (emphasis omitted) (quoting Heritage, 152 Wn.2d at 218).

7

also testified that he spent less than 10 minutes speaking with both Hibszki and Stoltman, and spent some of the 25 minutes writing out a citation.

The fact that the officer questioned Stoltman on the agency boat does not transform the investigatory stop into custody, the equivalent of a full arrest. In this case, the officer twice asked Stoltman if he would speak to him on the agency boat, and both times Stoltman stepped onto the agency boat. There is nothing in this record to support any claim that Stoltman was coerced.

Assuming without deciding that Stoltman's movement to the agency boat was a "physical intrusion upon [his] liberty," it was much less than the intrusion in Wheeler, which the supreme court held was part of an investigatory stop.[19] In that case, the suspect was handcuffed, placed in a police car, and transported two blocks for identification.[20] Here, Stoltman was not handcuffed and boarded the agency boat next to his boat, after he was asked to do so by the officer.

The two boats were next to each other, so Stoltman moved only a short distance for purposes of the questioning, far less than the two blocks under the facts of Wheeler.

Accordingly, this was a valid investigatory stop that never escalated to custody, the equivalent of an arrest. Thus, Miranda warnings were not required. The trial court did not err in admitting Stoltman's statements and denying the motion to suppress them.

---

[19] See Wheeler, 108 Wn.2d at 235-37.

[20] Id. at 233.

Stoltman argues that he was in custody because the officer moved him onto the boat, and no crime had been reported. Under Wheeler, transporting a suspect during an investigatory stop is "'impermissible when the defendant's conduct was suspicious but there has not been any report of a crime recently in the vicinity.'"[21]

But the informant had reported that Hibszki and Stoltman intended to commit a crime—taking more cable. Stoltman does not challenge the validity or reliability of the report that the informant made. Thus, we fail to see the analytical significance in the fact that the informant reported that Stoltman intended to commit a crime, rather than reporting a completed crime. Accordingly, this argument is unpersuasive.

### CrR 3.6 Motion

Stoltman next argues that the trial court erred by failing to suppress the physical evidence that the officer seized from Stoltman and Hibszki. Specifically, Stoltman argues that the officer lacked probable cause to seize the evidence. He is mistaken.

Courts generally presume that warrantless searches and seizures violate both the federal and state constitutions.[22] But the State may rebut this

---

[21] Id. at 237 (internal quotation marks omitted) (quoting 3 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 9.2, at 26 (Supp. 1986)).

[22] State v. Gatewood, 163 Wn.2d 534, 539, 182 P.3d 426 (2008).

9

presumption by showing that a search falls within one of the narrow exceptions to the warrant requirement.[23]

One exception to the warrant requirement is the plain view doctrine. "'A plain view search' occurs when law enforcement officers '(1) have a valid justification to be in an otherwise protected area and (2) are immediately able to realize the evidence they see is associated with criminal activity.'"[24]

Courts consider "both the prior information known to police and the surrounding circumstances when evaluating whether items were immediately apparent as evidence."[25] For example, officers properly searched and seized stolen radio equipment when they had already found stolen property on the premises, knew the house belonged to a convicted felon, and the amount of radio equipment was "unusually large."[26]

Under the plain view doctrine, officers do not need to be certain that the item is associated with criminal activity—probable cause that the item is evidence is sufficient.[27]

---

[23] State v. Day, 161 Wn.2d 889, 893-94, 168 P.3d 1265 (2007).

[24] State v. Ruem, 179 Wn.2d 195, 200, 313 P.3d 1156 (2013) (quoting State v. Hatchie, 161 Wn.2d 390, 395, 166 P.3d 698 (2007)).

[25] State v. Garcia, 140 Wn. App. 609, 625, 166 P.3d 848 (2007).

[26] State v. Legas, 20 Wn. App. 535, 542, 581 P.2d 172 (1978).

[27] State v. Hudson, 124 Wn.2d 107, 118, 874 P.2d 160 (1994).

Here, the court correctly concluded that the officer had probable cause to seize the pipe valve and the other items found in the bag after the officer obtained permission to search the bag. These circumstances and the officer's knowledge about the prior night's events provided probable cause.

The prior night, the officer had caught Stoltman and Hibszki with stolen cable they intended to sell as scrap metal. Additionally, the officer knew that Stoltman and Hibszki told the informant that they were going out to get more cable. And the officer saw a large pipe valve on the floor of Stoltman and Hibszki's boat, which was where the officer had seen the stolen cabling the prior night. The officer observed that the pipe valve "really looked out of place" and "obviously came from a large ship."[28] And the pieces of copper and brass in Stoltman and Hibszki's bags appeared "freshly cut."[29]

Further, Stoltman and Hibszki gave conflicting statements about how they came into possession of the valve when separately questioned. Stoltman stated that he did not know where the valve came from, and that it had been on the boat when he boarded. Hibszki stated that he and Stoltman had gotten the valve from some friends.

Under these circumstances, the officer had probable cause to believe that the pipe valve and other metal fittings were stolen property.

Stoltman argues that the officer lacked probable cause based on the officer's testimony at the suppression hearing. Specifically, he points to a

---

[28] Report of Proceedings (Aug. 29, 2013) at 33, 95.

[29] Clerk's Papers at 116.

11

statement by the officer that he "wanted to determine whether or not [the pipe valve] was stolen."[30] Stoltman argues if the officer needed "to determine" whether the pipe valve was stolen, it was not immediately apparent as evidence.

But the context of the officer's statement shows that it was made regarding his decision to question Stoltman and Hibszki, not his decision to seize the valve. After Stoltman and Hibszki could not convincingly explain how they acquired the valve, the officer had probable cause to believe it was stolen.

Stoltman also points to the officer's statement that he "probably had probable cause."[31] But the court, not the officer, decides whether probable cause existed. Thus, we reject this argument.

Stoltman also argues that this case is analogous to State v. Murray.[32] But Murray is distinguishable from the present case.

In that case, officers had consent to search an apartment for equipment stolen from a school.[33] During the search, an officer saw a portable television.[34] The officers were not looking for the television, because it was not missing from the school.[35] Although "there was nothing unusual about the location of [the television] as to its utility and usability," the officer seized the television to copy its

---

[30] Report of Proceedings (Aug. 29, 2013) at 33.

[31] Id. at 95.

[32] 84 Wn.2d. 527, 527 P.2d 1303 (1974).

[33] Murray, 84 Wn.2d at 528-29.

[34] Id. at 529.

[35] Id. at 536.

serial number.[36] Under those circumstances, the officer did not have "immediate knowledge" that the television was evidence of a crime.[37]

Here, in contrast, the pipe valve appeared out of place, and Stoltman and Hibszki made conflicting statements about how they came into possession of it. Additionally, as described earlier, the officer knew not only that Stoltman and Hibszki had stolen scrap metal the night before, but also that they were planning to steal more that night. Thus, the circumstances in this case are distinguishable from the circumstances in Murray.

Stoltman also assigns error to three of the court's factual findings. He argues that the trial court erroneously found that he told the officer that he and Hibszki were on a "pleasure cruise" on July 26, when he actually made the statement on July 27. Stoltman also challenges the finding that the officer found five metal handles in Stoltman's bag, arguing that he actually had seven. Finally, Stoltman alleges that the court erroneously found that, when Stoltman told the officer he was collecting the metal handles for a friend, Stoltman could not remember the name of his friend. These challenged findings are not material to the questions before us. Accordingly, we do not address them any further.

## PREACCUSATORIAL DELAY

Stoltman finally argues that the State's delay in filing charges violated his right to due process. We hold there was no violation of his right to due process.

---

[36] Id. at 534-35.

[37] Id. at 535.

The State's delay in filing charges may violate due process, even if the charges are filed within the statute of limitations.[38] Washington courts analyze preaccusatorial delay under a three prong test:

(1) [T]he defendant must show actual prejudice from the delay;

(2) if the defendant shows prejudice, the court must determine the reasons for the delay;

(3) the court must then weigh the reasons and the prejudice to determine whether fundamental conceptions of justice would be violated by allowing prosecution.[39]

This test allows the court to analyze "the underlying question of whether a delay has resulted in a due process violation by violating fundamental conceptions of justice."[40]

The State's preaccusatorial delay does not need to be intentional in order to violate due process.[41] But negligent delay requires greater prejudice to violate due process.[42] Delays caused by "sick leave, compensation time, vacations, and training courses are normal routine . . . [and] are as much a part of the judicial process as investigatory activities."[43]

---

[38] United States v. Lovasco, 431 U.S. 783, 789-90, 97 S. Ct. 2044, 52 L. Ed. 2d 752 (1977); State v. Oppelt, 172 Wn.2d 285, 288-89, 257 P.3d 653 (2011).

[39] Oppelt, 172 Wn.2d at 295.

[40] Id.

[41] Id. at 291-92.

[42] Id. at 292-93.

[43] State v. Alvin, 109 Wn.2d 602, 606, 746 P.2d 807 (1987).

The loss of witness testimony because of a delay does not necessarily violate due process.[44] In State v. Oppelt, the defendant was charged with child molestation.[45] After the alleged molestation, the victim's great-grandmother gave the victim lotion for her genital area, and took the victim to a medical examination, which revealed redness around the genitals.[46]

The State filed charges after a six-year delay.[47] During the delay, the great-grandmother developed a medical condition affecting her memory and could not remember what type of lotion she gave to the victim.[48] The defendant argued that he had been prejudiced, because he could not discover the type of lotion that had been applied, and thus could not determine if the lotion could have caused the redness.[49] The court rejected this argument, because the defendant could still argue that the lotion might have caused the redness.[50]

---

[44] See Oppelt, 172 Wn.2d at 296.

[45] 172 Wn.2d 285, 257 P.3d 653 (2011).

[46] Id. at 287.

[47] Id. at 288.

[48] Id. at 296.

[49] Id.

[50] Id.

This court reviews de novo whether preaccusatorial delay violates due process.[51] The court reviews "the entire record to determine prejudice and to balance the delay against the prejudice."[52]

Here, the State's preaccusatorial delay did not violate due process.

We agree with the trial court determination that Stoltman suffered some prejudice. During the State's delay in filing charges, the informant died. Thus, Stoltman was unable to interview the informant.

The court also found that the State's delay was not intentional. The court found that the officer who investigated the case "put all of his investigations on 'the back burner' so that he could care for his father." The officer testified that other officers in his department could not work on his cases due to their workloads.

Here, balancing the prejudice and the reasons for the delay, there was no violation of due process. Because the State's delay was not intentional, Stoltman must show a higher degree of prejudice.

Although Stoltman lost the ability to interview a potential witness, he does not point to any specific information that the witness would have provided to assist in his defense. Instead, Stoltman argues that he was unable to investigate the informant's statements to the officer. But, just as in Oppelt, Stoltman was still free to make an argument. He could have argued that the court should not trust

---

[51] State v. McConnell, 178 Wn. App. 592, 605, 315 P.3d 586 (2013), review denied, 180 Wn.2d 1015 (2014).

[52] Oppelt, 172 Wn.2d at 290.

16

the informant's statements. And Stoltman was able to extensively cross-examine the investigating officer on the informant's criminal history and reliability, which he does not challenge in this appeal.

Additionally, the delay in this case has been characterized as "normal routine" in the cases. Delays caused by "sick leave, compensation time, vacations, and training courses are *normal routine* . . . [and] are as much a part of the judicial process as investigatory activities."[53]

Thus, the prejudice to Stoltman was slight, and the State had valid reasons for the delay. Accordingly, we conclude that the delay did not "violat[e] fundamental conceptions of justice."[54]

Stoltman also argues that he was prejudiced because the delay affected his ability to plea bargain. The State was unwilling to allow Stoltman to plead guilty to lesser misdemeanor charges, as the statute of limitations for misdemeanors had already run. But defendants have a right to plead guilty as charged by the State.[55] They do not have a right to plead guilty to lesser offenses.[56] Accordingly, Stoltman's argument is unpersuasive.

Stoltman also argues that he was prejudiced by the State's delay, because the delay allowed the State to "upgrade[] its technology" to search for palm prints. During his investigation, the Fish and Wildlife officer found a partial

---

[53] Alvin, 109 Wn.2d at 606 (emphasis added).

[54] Oppelt, 172 Wn.2d at 295.

[55] State v. Bowerman, 115 Wn.2d 794, 799, 802 P.2d 116 (1990).

[56] See id.

palm print on the vessel from which the valve and pipes were removed. In 2010, King County was unable to search for palm prints in its database. In 2013, the State was able to run the palm print through its database, and locate an additional witness.

But Stoltman does not cite to any authority indicating that technological advances during a preaccusatorial delay prejudice the defendant. Accordingly, we need not address this argument any further, as it is unpersuasive.

We affirm the judgment and sentence.

_Cox, J._

WE CONCUR:

_Spelman, C.J._

_Dwyer, J._